Per Curiam :
This case was referred pursuant to Buie 45 (since April 1,1964, Rule 57) to Lloyd Fletcher, a trial commissioner of this court, with directions to make findings of fact and recommendation for conclusion of law. The commissioner has done so in a report filed February 20, 1964. Exceptions to the commissioner’s findings were taken by the plaintiff, briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Defendant is entitled to recover under its counterclaim the sum of $6,723.96, plaintiff is entitled to recover only the sum of $356.20 under the claim set forth in paragraph 13 of its petition. All other claims of the petition are dismissed. Therefore, defendant is entitled to recover from the plaintiff the net sum of $6,367.76.
OPINION OE COMMISSIONER
The Government contract involved in this case called for the manufacture by plaintiff of 1,031 mechanisms known as *876 M3A1 thrusters. The thruster is an important part of the escape system used in high speed jet aircraft in that it provides the propelling force which enables the crew to eject from the aircraft in case of emergency. As a life-saving device, it must be manufactured with precision and to exacting standards.
As the lowest bidder, plaintiff was awarded the contract by the Army Ordnance Corps which was charged with the responsibility of obtaining thrusters for the Air Force. It is admitted that plaintiff failed to deliver 548 of the 1,031 thrusters called for by the contract. Because of this failure, the contracting officer terminated the contract for default, reprocured the 548 thrusters from another manufacturer, and charged plaintiff with the excess costs incurred by the Government in such reprocurement.
In this suit for damages, plaintiff has alleged that the following actions by defendant delayed plaintiff’s performance of the contract for which delays it should be compensated, and that its admitted failure to perform was without plaintiff’s fault or negligence and therefore excusable. After the contract was awarded, the responsibility for its administration was transferred by the Government from Frankford Arsenal to the Philadelphia Ordnance District (finding 5); the Government delayed in furnishing to plaintiff extra copies of drawing prints (finding 6); an error existed in the contract drawings which plaintiff received from the Government (finding 7); damage occurred to plaintiff’s plant from a hurricane (finding 8); contrary to alleged custom, the defendant refused to allow plaintiff the use of defendant’s final inspection gauges (finding 9) ; the defendant required passivation of stainless steel parts (finding 10); the resident inspector refused to authorize shipment of the thruster pilot-lot until October 7,1955 (finding 11) ; defendant wrongly rejected 143 body components for tight threads (finding 13); the defendant stripped and reanodized 137 body components and damaged them (finding 14) ,• defendant’s resident inspector followed unreasonable inspection procedures (finding 15); and the defendant unjustifiably re *877 quired that the interior of the breech component be plated (finding 16).
In view of the conclusions recommended to the court herein, no useful purpose would be served by restating at this point the detailed facts surrounding each of plaintiff’s aforesaid allegations. Those facts are fully set forth in the findings below.
Suffice it to say that a hearing before the asbca was scheduled on plaintiff’s appeal from the contracting officer’s determination that plaintiff had defaulted in failing to deliver 548 thrusters and that “* * * said default is not due to any circumstance that would amount to an excusable delay.” On November 30,1959, following a full hearing, the asbca issued its findings and decision as to the excusability of plaintiff’s' default. After discussing in detail each of plaintiff’s claims, the asbca concluded as follows:
From the evidence as a whole we fail to find merit in appellant’s contention that the termination for default should be deemed to have been made for convenience of the Government. We are of the opinion, and so find, that appellant’s failure to perform was not the result of causes beyond its control and without its fault or negligence. In this respect appellant’s appeal must be denied.
All of the claims presented by plaintiff to this court and to the asbca (with the exception of the dispute as to plating the interior of the breech component) deal with questions of fact leading to the ultimate question of whether plaintiff’s default was excusable. This court on several occasions has held in similar circumstances that whether a default is excusable is clearly a question of fact. Anthony P. Miller, Inc. v. United States, 161 Ct. Cl. 455, 474 (1963), cert. denied, 375 U.S. 879; Whitlock Corporation v. United States, 141 Ct. Cl. 758, 764 (1958), 159 F. Supp. 602, 607, cert. denied, 358 U.S. 815; Joseph A. Holpuch Company v. United States, 102 Ct. Cl. 795, 803, 58 F. Supp. 560, 564 (1945). The decision of the asbca was, therefore, final and conclusive on the parties, absent a showing that it was fraudulent, capricious, arbitrary, or not supported by substantial evidence under the “Wunderlich Act,” 68 Stat. 81, 41 U.S.C. §§ 321-322. Plaintiff has made no such showing here. The record before the *878 asbca, as well as the de novo record in. this court, fully support the Board’s decision and, accordingly, it is final and conclusive.[1]
With respect to one matter, however, plaintiff has here raised a question of law involving the interpretation of the contract specifications dealing with plating. (See finding 16.) After delivery by plaintiff of 483 thrusters, defendant’s resident inspector concluded that the interior opening within the breech components of the thruster had not been plated. Plaintiff agreed that the interiors of the breeches manufactured by it had not been plated by its plating subcontractor, but it contended that such plating was not required either by the drawings or by the specifications. The drawing for the breech specified that it should have protective finish of “Type I, class T.S.C. (Cadmium Plate) Spec. 57-0-2 * * *” There was no exception entered on the drawing to eliminate the breech interior from the plating requirement. However, plaintiff pointed to the fact that the breech interior could not be touched with a sphere three-quarters of an inch in diameter and therefore claimed an exception under the following paragraph of Specification 57-0-2:
E-le. Thickness. Unless otherwise specified, the minimum thickness of plating on significant surfaces shall be as given in Table I. Significant surfaces (See paragraph'Ii-7), for thickness determinations only unless otherwise specified, are those parts of the visible surfaces that can be touched with a sphere % inch in diameter.
The defendant, however, considered that the quoted specification related only to the required thickness of the plating and did not justify complete elimination of plating. Accordingly, in May 1956, defendant notified plaintiff that no more thrusters would be accepted by defendant if they were un-plated in the breech interior.
There is conflict in the testimony with respect to trade practices in the plating industry where a small interior surface, such as this one, is involved. The weight of such testi *879 mony, however, favors the conclusion that an instruction on the drawing or in the specification requiring a protective coating or plating applies to the entire part, including small interior surfaces; that, further, to eliminate such interior surfaces from the plating requirement would necessitate a specific exception stated on the drawings or specifications. Accordingly, since here no exception was stated, it is concluded that plating of the breech interior was a contractual requirement in this case.
Unlike the contractor in Wingate Construction Company v. United States, 164 Ct. Cl. 131, 135 (1964), where after protesting a directive of the contracting officer, the contractor nevertheless continued with its work under the contract, plaintiff here simply abandoned the production of new parts after it was notified that the breech interior had to be plated. The Disputes Clause, however, provides the machinery to dispose of just this type of problem and specifically requires that: “Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.” Also, paragraph 24 of the contract, dealing with the interpretation of the specifications, states:
24. INTERPRETATION' OE SPECIFICATIONS l
_ On all questions relating to the acceptability of materials or equipment, classification of materials, the proper execution of the work, and the interpretation of the specifications, the decision of the Contracting Officer shall be final, provided no appeal is taken in accordance with General Provision 12, entitled “Disputes”.
Thus plaintiff could not justifiably abandon production simply by reason of a disagreement arising under the Disputes Clause.
But plaintiff says that, by this time, its financial status had deteriorated to the point where it could have continued performance only at serious risk of bankruptcy. Financial inability to complete performance of the contract, however, does not relieve the plaintiff of its contractual obligations unless under paragraph 11(b) of the contract its failure to perform “ * * * arises out of causes beyond the control and *880 without the fault or negligence of the Contractor.” With respect to this, the asbca concluded as follows:
It has not been shown in this case, as in the appeal of Union Electric and Manufacturing Co., Inc., ASBCA No. 3811, 58-2 BCA par. 1966, cited by appellant, that the Government specifications were impossible of performance. It is true that the fabrication of the thruster called for work of a precise, intricate nature to comply with dimensional requirements within tight tolerances. That the efforts of a contractor of appellant’s reputation to meet the exacting requirements may have resulted in an expense far in excess of its contractual remuneration and that its difficulties in performance may have become well-nigh insurmountable is indeed to be regretted. These circumstances, however, do not furnish grounds for avoidance of responsibility for fulfillment of its contractual obligations.
Plaintiff urges that, instead of termination of the contract by reason of default under paragraph 11(a), the Government should have terminated the contract for its own convenience under paragraph 11 (e) which reads as follows:
(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be governed by such clause. * * * ■
The asbca found that plaintiff’s failure to perform was not due to “* * * causes beyond the control and without the fault or negligence of the contractor pursuant to the provisions of paragraph (b) of this clause * * *” This determination, as discussed earlier, is a finding of fact which is final and conclusive under the Wunderlich Act since it is supported by substantial evidence. The Board’s determination that plaintiff’s default was not excusable within the meaning of paragraph 11(b) precludes the operation of paragraph 11(e), and the contract cannot, therefore, be considered to *881 have been terminated for the convenience of the Government. To the contrary, the evidence both before the asboa and before this court shows that the contract was properly terminated for plaintiff’s default.
In one instance, however, the plaintiff successfully carried its burden of proving damages flowing from an action committed by defendant beyond its contractual rights. Plaintiff was required to, and did, remanufacture 137 body components which, the weight of the evidence shows, were damaged by the Ordnance Corps itself in chemically stripping the plating therefrom. Further details as to this matter are contained in finding 14, m/m. Plaintiff satisfactorily proved that this action by defendant damaged plaintiff in the sum of $356.20. In all other respects, plaintiff has failed to prove the allegations of its petition.
Finally, there remains the question of whether, under the circumstances of this case, the defendant may properly charge plaintiff with excess costs incurred by defendant in its reprocurement of the 548 thrusters which plaintiff failed to deliver under its contract. The actions taken by defendant in the reprocurement are detailed in the findings. In summary, they show that the Ammunition Group Procurement Assignment Board of the Ordnance Corps at Frankford Arsenal concerned itself with the problem of plaintiff’s failure to complete its contract some two months prior to formal termination of plaintiff’s contract. At that time, the Board was considering a new procurement of 1,902 thrusters which were so urgently required by the Air Force that a negotiated contract with the only manufacturer in production, American Optical Company, seemed to the Board to be the only practical solution. Being cognizant of the delinquent status of plaintiff’s contract, and anticipating a reprocurement thereunder, the Board recommended obtaining alternative quotations from American Optical, one on 1,902 thrusters only, and another on 1,902 plus the 548 thrusters undelivered by plaintiff. This, it was thought, might serve to hold repurchase costs to a minimum. Quotations were obtained from American Optical, which were identical under either alternative. These negotiations only resulted in a contract *882 with. American Optical for the 1,902 thrusters at a unit price of $38.40 (later reduced to $34.90). At this time, plaintiff’s contract had not yet been formally terminated.
A few days after plaintiff’s contract was terminated for default, the Board met again to consider the reprocurement of the 548 undelivered thrusters, together with a new requirement of 2,013 thrusters, or a total procurement of 2,561 thrusters. These items were enumerated on the Vital Items List and continued to be urgently required by the Air Force. Therefore, as in the case of the previous contract, the Board concluded that procurement by negotiation, rather than competitive bidding, was justified. American Optical continued to be the only proven producer then manufacturing the thruster, and Frahkford Arsenal transmitted the procurement authority to the Boston Ordnance District for direct negotiation with American Optical on the additional quantities required.
Boston Ordnance District thereupon again solicited quotations from American Optical. As in the case of the negotiations for the 1,902 thrusters, American Optical was requested to quote on alternative bases, but once again the resulting quotations were identical under both alternatives. This time, however, American Optical’s quotation was at the lower figure of $31.92 per thruster to which was added an additional cost for more gauges resulting in a total unit price of $32.87.
A detailed price analysis of this quotation was made by Boston Ordnance District, and it was concluded that $32.87 constituted a fair and reasonable price. Accordingly, after one final but futile effort to induce American Optical to reduce the price still further, the Government entered into a contract with American Optical for the manufacture of 2,605 thrusters which amount included replacements for the 548 thrusters not delivered by plaintiff.
Thereafter, the contracting officer computed the difference between plaintiff’s contract price of $19.48 per thruster and American Optical’s contract price of $32.87 per thruster, multiplied the difference by 548 for a total excess cost of $7,338.61 and demanded payment thereof from plaintiff.
This determination by the contracting officer was appealed by plaintiff to the asbca. After a full hearing, the asbca *883 issued a decision in which, it sustained the contracting officer’s actions except in one respect. By the time of the repurchase contract with American Optical, the M3Ai thruster was being manufactured under a revised engineering specification (Revisión 4) which differed in minor respects from the specification applicable under plaintiff’s contract (Revision 3). The asboa calculated that there was possibly as much as 85 cents additional cost involved in producing thrusters under Revision 4 as contrasted to Revision 3. Believing it to be “only equitable” to take this difference into account, the asboa reduced the contracting officer’s excess cost figure by 85 cents per unit to a resulting total of $6,723.96.[2] Otherwise, the excess cost assessment was approved. ■
Plaintiff disputes the validity of the counterclaim in its entirety and asserts that, in the mitigation of its damages, defendant was required to resort to competitive bidding procedures. However, plaintiff has pointed to no authority in support of its contention, and clearly the contract provision itself does not require reprocurement by competitive bid procedures. It simply states that when the Government has terminated the contract for default—
the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies * * * similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies * * *
This provision vests “a broad discretion in the Contracting Officer.” United States v. Warsaw Elevator Co., 213 F. 2d 517, 518 (2d Cir. 1954). While such broad discretion must *884 not be abused by the contracting officer, there is certainly nothing in the contract provision which could be interpreted as requiring the reprocurement to be accomplished by competitive bidding pursuant to formal advertising procedures. See Lester Brothers, Inc. v. United States, 151 Ct. Cl. 536 (1960); Thomas E. Zoda v. United States, 148 Ct. Cl. 49, 180 F. Supp. 419 (1960); Westwood Lumber Sales, asbca No. 3751, 57-2 bca par. 1457, Sept. 30, 1957; and Republic Distributor Company, asbca No. 5167, 59-2 boa Par. 2317, August 11,1959. Plaintiff’s assertion to the contrary entirely overlooks the fact that the statutory requirements of advertising for competitive bids are for the protection of the Government, and not those dealing with it. American Smelting & Refining Co. v. United States, 259 U.S. 75 (1920). In commenting upon defendant’s negotiations with American Optical Company, plaintiff frankly admits:
Defendant was most scrupulous about getting a better price for itself but not in the least concerned about getting a good price for plaintiff.
It would hardly seem that the doctrine of mitigation of damages should require the innocent party to do more than be “scrupulous” in getting as good a price for itself as it could. More benevolence should not be expected even from a sovereign.
Although the authorities cited above clearly establish that the reprocurement provision here involved does not require the contracting officer to proceed by formal advertising for competitive bids, in each of the cited cases the contracting officer in fact did obtain more than one bid on the reprocurement. Here, however, defendant dealt solely with one bidder, American Optical. In their discussions of the authorities, neither the parties nor the asboa have commented on this factual distinction. Nonetheless, consideration should be given to the question of whether defendant’s failure to obtain more than one bid on the reprocurement has undermined its right to claim excess costs from the defaulter.
Under the rationale of the Lester Brothers and Zoda decisions, supra, the answer to this question appears to lie in the asking of still another question. In obtaining the re- *885 procurement, did the contracting officer act as a reasonable man would have acted under the same circumstances? In Zoda, for example, the court referred to its inability to find anything “unreasonable” in the contracting officer’s relet procedures, and in Lester Brothers, his methods of repro-curement were “not imprudent.”
Thus, it seems clear that, in its consideration of relet or reprocurement actions by contracting officers, the court has adopted a test of reasonableness under all the circumstances. Such a determination, i.e., what would a prudent man have done under the same circumstances, is typically and traditionally a question of fact. See Thayer, A Preliminary Treatise on Evidence at the Common Law, p. 228 (1898); cf. Holmes, The Common Law, p. 126 (1881).
This being so, the determination by the asboa that the contracting officer’s actions were reasonable is final and conclusive unless the determination fails to meet the standards of the “Wunderlich Act,” 68 Stat. 81, 41 U.S.C. §§ 321-322. Substantial evidence in the record before it amply supported the asboa finding that American Optical was, at the time of reprocurement, the lowest cost producer of established reliability in the fabrication of the M3Ai thruster. Manufacturers who had previously fabricated this precision mechanism (other than plaintiff) were, by that time, bidding prices higher than American Optical’s price. A sincere belief in the urgency for the reprocurement motivated Frankford Arsenal to authorize direct negotiation with American Optical as the only proven producer in production. The anticipated quick deliveries by American Optical did not in fact materialize. Nonetheless, this fact, standing alone, is insufficient to render the reprocurement defective since, as found by the asboa, it was reasonable for defendant to anticipate that it would obtain earlier deliveries from American Optical than from any other producer in sight. Under all the circumstances, the defendant’s reprocurement actions here were “not imprudent”. Lester Brothers, Inc. v. United States, supra. See, also Appeal of Caddo Business Machines, asbca 7952, 62 bca 3450 (1962). Accordingly, it is recommended that, pursuant to paragraph 11 (c) of the contract, *886 judgment be entered for defendant on its counterclaim. The amount of the judgment should be computed as $6,728.96 (the asbca finding as to excess costs) less $356.20 (the amount due plaintiff for its remanufacture of 137 bodies damaged by defendant as described in finding 14, infra) for a net judgment of $6,367.76.
FINDINGS OF FACT

Preliminary Matters and DeseHftion of the Contract

1. Plaintiff, H & H Manufacturing Company, Inc., is a corporation organized under the laws of Pennsylvania with its principal place of business located in Clifton Heights, Pennsylvania.
2. On May 6,1955, Frankford Arsenal, Department of the Army, Philadelphia, Pennsylvania, issued an invitation to bid (Invitation No. oed-36-038-55-866) for the manufacture of 1,031 thrusters, M3Ai, in accordance with ke-bp-40, Bev. 3, dated April 10, 1955, delivery f.o.b. Frankford Arsenal. A pilot lot of 15 thrusters was to be delivered by August 15, 1955, and production lots were to be delivered as follows: 316 by September 25,1955; 316 by October 25,1955; and 384 by November 25,1955.
3. There were 21 bids submitted in response to the aforesaid invitation ranging from $19.13 per thruster to $410.00 per thruster. Plaintiff was the lowest bidder at $19.13 per thruster, and as such low bidder was awarded the contract. On or about June 24,1955, Contract No. da-36-038-okd-19235 was executed between plaintiff and the United States Army Ordnance Corps. The contract required plaintiff to manufacture and deliver 1,031 thrusters, M3Ai, in accordance with ke-bp-40, Bev. 3, dated April 10, 1955, at $19.13 each, for a total consideration of $19,723.03.[3]
Thrusters are cartridge actuated devices used in the ejection portion of the escape system of high-speed jet aircraft. They are designed for installation in such aircraft, and when actuated by the pilot, their function is to eject the flight crew from the aircraft in event of emergency. Being life-saving *887 devices, and containing explosive forces, they must be manufactured with precision and under exacting standards.
4. Contract No. da-36-038-orb-19235 contained the following pertinent clauses and provisions:
* * * *
8. GOVERNMENT-FURNISHED PROPERTY.—
No material, labor, or facilities will be furnished by the Government unless otherwise provided in the Schedule.
*****
24. INTERPRETATION OE SPECIFICATIONS t
On all questions relating to the acceptability, of materials or equipment, classification of materials, the proper execution of the work, and the interpretation of the specifications, the decision of the Contracting Officer shall be final, provided no appeal is taken in accordance with General Provision 12, entitled “Disputes”.
% % . H; 4 % . %
DELIVERY: E.O.B. FRANKFORD ARSENAL . ' •.
* * * * *
PILOT lot:
An acceptable Pilot Lot will be delivered to Frank-ford Arsenal by 15 August 1955. An acceptable Pilot Lot shall consist of 15 each thrusters M3Ai, 5 assembled and 10 complete, but unassembled thrusters ■ M3A1. Frankford Arsenal will inspect and notify the Contractor of inspection results by 25 August 1955. * * *
Production lots to be delivered as follows:
316 each by 25 September 1955 316 each by 25 October 1955 384 each by 25 November 1955
inspection and acceptance : The Pilot Lot will be inspected at Frankford Arsenal by Arsenal Personnel. The production lots will be inspected at Contractor’s Plant by the Ordnance District in which Contractor’s Plant is located.
inspection: Acceptance and inspection will be accomplished by Ordnance personnel using sample plans in accordance with mil std 105a, dated 11 September 1950 and quality levels referred to in Standard Inspection Procedures wherever applicable. Wherever no Standard Inspection Procedures are available, quality levels in accordance with Arsenal or District practices *888 will be utilized. However Government inspection personnel reserve the right to do 100% inspection if considered necessary.
# * * * *
general provisions
*****
2. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipping or packing; and (iii) place of delivery. If any such change causes an_ increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
*****
5. INSPECTION
(a) AJ1 supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
*****
(d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other fail *889 ures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
(e) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the supplies hereunder. Records of all inspection work by the Contractor shall be kept complete and available to the Government during the performance of this contract and for such longer period as may be specified elsewhere in this contract.
* * * * *
11. DEFAULT
(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
(b) _ The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes? freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.
(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer *890 may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, Provided, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.
* ifc # #
(e) If, after notice of termination of this contract .under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been-issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights'and obligations of the parties hereto shall in such event, be governed by such clause. (Except as otherwise provided in this contract, this paragraph (e) applies only if this contract is with a military department.)
(f) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.
12. DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
*891 21. TERMINATION FOR CONVENIENCE. OF THE GOVERNMENT.
(a) The performance of work under this.contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected1 by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective.

The Facts With Respect to Plaintiff's Several Claims-

5. On July 21, 1955, shortly after award of the aforesaid contract, the responsibility for its administration was transferred by the Government from Frahkford Arsenal to the Philadelphia Ordnance District. Plaintiff alleges that this action delayed it two weeks in the performance of the contract. For a brief period during the transfer process, plaintiff experienced some difficulty in contacting Government personnel responsible for the administration of the contract. However, no specific instances of delay to its production under the contract were shown by plaintiff to have occurred. Also, Mr. Poland F. Beagle, plaintiff’s plant supervisor, testified as a witness for the plaintiff that, during this period, there was other work available for his labor force. Thus, no idle time should have resulted from any.possible delay.
At the hearing of this matter before the Armed Services Board of Contract Appeals (asbca), no substantial evidence was introduced by plaintiff to support its allegation that a two-week delay to its performance was caused by defendant’s transfer of the administration of the contract. Accordingly, neither before the asbca, nor this court, has plaintiff demonstrated that its production under the contract was unreasonably delayed by the transfer of administration.
6. Plaintiff has asserted that it was further delayed in performance under the contract by reason of a delay by defendant in furnishing to plaintiff extra copies of drawing prints. At the time it prepared its bid, plaintiff had one complete set of drawings. This original set had been fur *892 nished pursuant to the following provision of the Invitation for Bids (which later became a part of the contract):
25. ORDNANCE DRAWINGS.
When items are advertised under Ordnance drawing numbers, such drawings are available and will be furnished upon request directed to any Ordnance District and items supplied must conform to these Ordnance Drawings.
For added efficiency and convenience in manufacture of the thrusters, plaintiff needed more than one set of drawings for use by machinists and various shop personnel. Plaintiff could have made shop drawings itself from the Government prints, but it had a policy against doing so because of the possibility of resulting error, since shop drawings are not as accurate as prints made from the original tracings. It therefore requested that the Government furnish additional copies of the drawings. In this connection, specification Min — g—2550, included by reference in Contract 19285, as amended, contained the following pertinent provisions:
11. Drawings and specifications. * * *
a. Prescribed design. In cases where the War Department contracts for material of a prescribed design, the Department will furnish to the contractor a set of prints for use in manufacture. * * * [Emphasis added.]
5|í * * ‡
d. Working drawings. All necessary copies of working drawings shall be provided by the contractor, who shall furnish the inspector with such prints of those drawings as may be required for his information. * * * [Emphasis added.]
Notwithstanding the above-quoted provisions, the Government without charge furnished plaintiff two additional sets of drawings, the receipt of which was acknowledged by plaintiff on August 5, 1955. Plaintiff asserts this should have been done over a month before that date and that it was therefore delayed in performance.
With regard to this matter the asbca found as follows:
Appellant had only one set of drawing, prints until the end of August 1955, when others were forwarded. The pilot lot was due 15 August 1955. It would have been *893 possible to start work with one set of prints, but it was not practicable or efficient. The Government did not forward additional copies until 31 August 1955.[4]
* * * * *.
With respect to the effect on plaintiff’s work of an inadequate number of sets of drawing plans, the asbca continued:
* * * There can be no question but that this delayed manufacture of the pilot lot, and perhaps other units. On the other hand, the pilot lot was accepted, subject to certain corrections to be made, when it was presented, and the extensions of the delivery schedule granted by the Government were more than enough to provide for this delay.
The asbca suggestion that the inadequate number of drawings in plaintiff’s possession delayed manufacture not only of the pilot lot but of “perhaps other units” is of doubtful accuracy. Although plaintiff had received additional sets of drawing plans by August 5,1955, the small pilot lot itself, consisting of 15 thrusters, was not completed until September 8, 1955. See finding 11, infra. Since any resulting delay to plaintiff’s performance would have occurred prior to August 5,1955, it cannot be concluded that the allegedly late receipt of drawing plans unreasonably affected the production of thrusters subsequent to the pilot lot.
It has, therefore, been shown by a preponderance of the evidence before the asbca, as well as by the evidence adduced at trial, that the plaintiff’s production under this contract was not unreasonably delayed by the receipt on August 5, 1955, of the additional drawing plans, even if it be assumed that defendant was obligated to furnish such additional drawings.
7. An error existed in the original contract drawings which plaintiff received from the defendant, and plaintiff claims that this delayed its performance and increased its manufacturing costs. The depth of the internal seat of the thruster’s body component was marked on the original drawings as .613 instead of .618 (the correct specification) due to the omission or blurring of part of the number “8”. During *894 manufacture of the pilot lot, this specification of depth was interpreted as .613 by both the plaintiff and the Government inspector, the printing error being subsequently discovered by use of the Government gauges during the inspection process. On September 8, 1955, defendant transmitted a clear drawing correctly defining the depth specification as .618.
Plaintiff has failed to show that the admitted error of .005 hi the original contract drawings resulted in any delay to it in the manufacture of either the pilot lot or subsequent lots. The testimony of plaintiff’s witnesses in this regard was to the effect that no rework or replacement resulted from the error in the drawing. According to plaintiff’s vice president, the reworking that was in fact done on the pilot lot had no connection with the erroneous dimension stated in the drawings. As the corrected drawing was received on September 8, 1955, prior to the manufacture of the post-pilot lots, plaintiff has shown no delay in its production which can be attributed to the error in the original drawing. The asbca found:
•i» «{•
There was a short delay while awaiting a clear copy of drawing #29278. * * *
•‡* «‡*
The defect in the drawing related to the depth of cavity. This did not affect the basis for the Arsenal’s complaint which we have already seen related to improperly cut threads.
The quoted finding is supported by a preponderance of the evidence before the asbca, as well as by the evidence adduced at trial in this court..
8. On August 18, 1955, plaintiff’s plant was flooded as a result of hurricane “Diane.” Four days were required to clean up the shop and to get the plant back into operation. Also, for an unspecified period of time, plaintiff experienced intermittent difficulties with some of its electric motors which had been infiltrated with mud and silt. It claims that the hurricane thus caused an excusable delay in its performance and, further, was a contributing cause for its ultimate failure to complete the contract because of financial reverses di *895 rectly attributable to the storm. In this connection the asbca found as follows:
‡ * * $ H:
Hurricane “Diane” occurred on Thursday, 18 August 1955, flooding appellant’s shop and thereby making the plant inoperable for four days, until Monday, 22 August. For some time thereafter electric motors broke down from time to time because of the difficulty in cleaning and repairing them.
Hi H: ^
Appellant’s financial records disclosed for the fiscal year ending 31 July 1955 that current assets exceeded current liabilities by approximately $23,700 whereas for .the year ending 31 July 1956 the situation had deteriorated to an excess of liabilities of approximately $33,000. Appellant’s vice-president testified that in his opinion the flood from hurricane “Diane” probably cost the appellant in the neighborhood of $20,000 to $25,000 which is reflected not in the increase of cost on the books but in loss of anticipated profit on its commercial work. Net sales for the year ending 31 July 1956 amounted to $520,421, approximately $9,408 thereof representing payments under this contract which constituted a very small portion of appellant’s business. Since on a comparable amount of business for the previous year there was an operating profit, appellant concludes that a portion of the changes in financial condition is due directly to the flood. However, the financial loss from the flood is not claimed of itself to he cause for failure to perform. [Emphasis supplied]
*****
The delay suffered by the plaintiff as a direct result of the flood damage was “excusable” under paragraph 11 (b) of the Default Clause contained in the contract, and, accordingly, plaintiff was not held accountable for such delay. The asboa found as follows:
*****
The delay was, however, concurrent with extensions of the delivery schedule granted expressly or by failure of the Government to terminate. No completed units were rejected because of delay in submission. ‘
* * * * *
The aforesaid finding is supported by substantial evidence. "Whatever may have been the effect of hurricane “Diane” on *896 plaintiff’s production, it was fully neutralized by the Government’s subsequent extension of the delivery schedule. The flooding of plaintiff’s plant was not the reason for plaintiff’s failure to perform this contract.
9. Under Contract 19235, Government inspection procedures were governed by Specification mil-g-2550. The pertinent provisions of that specification relating to inspection procedures, testing equipment, and the like, read as follows:
10. Mwmfaaturmg gages. All necessary working gages, templets, dies, jigs, fixtures, and similar special equipment shall be furnished by the contractor, except such as the War Department may prefer to furnish for the sake of insuring interchangeability. Upon application to the inspector, the contractor will be allowed to use gages belonging to the War Department for making such check tests as may be necessary to verify the correctness of his own testing equipment, but the inspector shall be the judge of the number of times, after the first time, that such check tests may be made. Such check tests shall in no case be understood as waiving any portion of the prescribed inspection; nor will allowance be made to the contractor for the time consumed in making such check tests.
ij» *Í» »J*
30. Sample method. Where acceptability is determined by test or inspection of a sample, failure of the sample to meet the specified requirements shall be grounds for rejection of the entire lot or sub-lot from which the sample was taken.
31. Contractor's inspection system. The contractor shall maintain a system of inspection adequate to assure that every piece and portion of the lot conforms to the requirements of the drawings and specification. If the inspection is inadequate, as evidenced by an excessive proportion of rejection at any time, the inspector may refuse to continue his inspection until the material has been again inspected by the contractor, and the contractor’s inspection procedure has been improved.
‡ ‡ ‡ $
36. Inspection lots.
a. Size. Unless otherwise specified, material and parts shall be submitted for inspection in lots or sublots of sizes satisfactory to the inspector.
*897 88. Gaging.
a. Availability of gages. The final inspection gages furnished by the United States will be used by the inspector or by direction of the inspector for gaging, but the contractor shall provide the use of his manufacturing gages, without charge, if requested by the inspector.
b. Accuracy of acceptance gages. Inspection gages for ammunition are made in accordance with the practice established by the Ordnance Department. Wear allowances and gage-maker’s tolerance for plug and ring gages are shown in Federal Specification ggg-o-61. In general, the actual measured size of gage may differ from the dimensions shown on the component drawing by the amount of the wear allowance plus the gage-maker’s tolerance, and may therefore consume that much of the component tolerance. In case such differences operate to reject any ammunition, the dimension or dimensions causing such rejection, upon request by the contractor and at his expense, shall be checked with the drawings, and in the event they conform thereto, the ammunition shall be accepted, provided it otherwise complies with the detail specification.
:ji ‡ ‡
45. Refection for inherent defects. Under any condition of inspection, if material which has been accepted contains inherent defects subsequently exposed, the contractor shall, if required, replace the defective material without expense to the Government.
In computing its bid price and in planning its production under the contract, plaintiff does not appear to have believed that it would require any special manufacturing or inspection gauges for the purpose of checking the dimensions on components parts of the thruster. Instead, it chose to rely on standard measuring instruments, such as micrometers. The mistake inherent in this decision was acknowledged by plaintiff’s president who, on September 6, 1956, wrote the contracting officer a letter stating in part:
We realize that a great deal of the delay and error in machine work is our responsibility, but the problem of gauges is still one that we have never been able to overcome.
The lack of adequate gauges proved to be a problem for plaintiff. The use of measuring equipment in the testing *898 of sucli a precision mechanism as the thruster required more time and labor than would have been the case with gauges. Measuring instruments, such- as micrometers, require numerous adjustments to obtain desired readings, whereas specially designed gauges provide a quick and accurate check with no adjustment required.
Plaintiff now appears to have acknowledged this fact. Although it did not do so before the asbca, it now complains, somewhat inconsistently, that it was delayed in its production by defendant’s failure to make available to plaintiff the Government’s own inspection gauges. Ignoring the lan-gauge contained in paragraph 10 of mil-g-2550, supra, plaintiff contends that there existed in the trade an “established custom” for the Government to make its inspection gauges available for use in production testing by a manufacturer such as plaintiff. • At the beginning of manufacture, defendant’s resident inspector would not allow plaintiff’s personnel the use of his final inspection gauges, and plaintiff complains that this delayed its performance.
The record contains no credible evidence which would show any established trade custom in derogation of the requirement of mil-g-2550, paragraph 10, that the contractor shall furnish its own working gauges. To the contrary, the testimony establishes that it would not be desirable to use final inspection gauges during the manufacturing process because of the substantially greater wear and tear which results to a gauge when used in the machine shop as contrasted to its use in the final inspection process. Also, manufacturing gauges are often made to slightly different tolerances than inspection gauges in order to allow for the subsequent addition of a protective coating on the part.
The record further shows that, although the Ordnance Corps would in no event allow the use of its inspection gauges by machinists during the manufacturing process, commencing about the middle of December 1955, the Corps did permit the use of its gauges by plaintiff’s own inspection staff. This was done in an effort to expedite delivery of the thrusters, which were urgently needed by the Air Force, in full recognition that such use of the Government gauges *899 would result in considerably more wear to them than would be true under usual conditions. Also, because of the Air Force’s urgent need for thrusters, and with hope of expediting delivery, the Ordnance Corps decided in January 1956 to abandon its preexisting system of inspection by the sampling process, as authorized by m:il-g-2550 and mxl-spd-105A. Instead, five additional Government inspectors were assigned to plaintiff’s plant, and there was inaugurated a 100 percent inspection system for any size lot of component parts presented by plaintiff for acceptance.
There is nothing in this record to support a- finding that defendant’s inspection system, or the handling of its inspection gauges, in any way caused, or contributed to, plaintiff’s failure to complete the contract.
10. As a result of the occurrence of rust pitting on the thruster firing pins which plaintiff had manufactured, plaintiff was requested on September 8, 1955, to passivate these and other similar items. “Passivation” is the technical term used to describe the cleaning process employed .when parts are fabricated from stainless steel, and its purpose is to remove. foreign matter from the surface of the part, thereby permitting the stainless steel to resume its inherent barrier to rust: Passivation is done as a matter of course in the processing of stainless steel. However, plaintiff objected to the request that it passivate the firing pins and, after an exchange of correspondence, submitted a claim for $20, its cost - “* . * * to do passivation on parts to complete the entire contract.” By letter dated December 21,1955, the Ordnance Corps denied plaintiff’s claim. In view of the specification requirement that “All parts shall be free of chips, dirt, grease and other foreign material * * and in view of the fact that passivation is a normally followed practice when fabricating stainless steel, the Ordnance Corps’ denial of plaintiff’s claim was clearly correct.
11, The production of an M3Ai thruster unit required the manufacture of a number of component items, including major items such as the breech, trunnion, cartridge, retainer, body, piston rod, end cap, and end sleeve. To comply with the contractual requirement (quoted above) as to a pilot lot, *900 it was necessary for plaintiff to manufacture sufficient components to enable it to deliver 15 completed thrusters to Frankford Arsenal by August 15,1955.
On August 5, 1955, plaintiff’s production manager requested a tentative two-week extension of the delivery date for the pilot lot. No formal action appears to have been taken by defendant on this request. Nelson D. Atwood, a Government machine parts inspector, was assigned to the plaintiff’s plant as resident inspector on August 10,1955, and thereafter, without objection by plaintiff, he preliminarily inspected the pilot lot components prior to their shipment to Frankford Arsenal, where by the contract the final inspection was to be conducted. This preliminary inspection disclosed several defective parts which were thereafter reworked !by the plaintiff. Plaintiff claims that the inspection activities of the resident inspector, and the delay in approval of the pilot lot, unreasonably interfered with its performance and increased the cost thereof. With regard to this matter, the asbca found as follows:
* * % % *
The contract provides that “an acceptable Pilot Lot will be delivered to Frankford Arsenal by 15 August 1955,” and that the Arsenal will inspect and notify appellant of the results by 25 August 1955. Parts sufficient to make up a pilot lot were completed by the end of July, but the Resident Inspector would not permit them to be sent to the Arsenal until he had inspected and approved them. His inspection resulted in some delay due .to his determination that some parts were defective and must be reworked, and to confusion and delays in the process of inspection. The Government urges that appellant’s submission of acceptable parts was so slow that these delays were not material. Appellant claims that the submission to Frankford Arsenal should not have been held up at all for inspection at the plant. The pilot lot so inspected and approved was sent to the Arsenal on 7 October 1955. Notification was forwarded to appellant by the Ordnance District memorandum of 21 October 1955 that it had been approved, subject to the correction in production of certain specified deviations.
The delivery schedule was revised on 26 October 1955, concurrently with notification of approval of the pilot lot. The new schedule provided for deliveries in the *901 same installments as the original, and at the same intervals of 30, 60 and 90 days after approval of the pilot lot. This extension covered the delay in inspection and approval of the pilot lot.
Considerable rework was done on the pilot lot after 27 July 1956. Furthermore, certifications of plating were not furnished by the subcontractor until 14 September 1955; and a pilot lot would not be acceptable to Frahkford Arsenal until all such certifications were furnished. The pilot lot was in fact approved, subject to certain corrections, and appellant was authorized to submit production units after certification. We seriously question whether appellant was free from fault for the delay in obtaining approval of the pilot lot.
*****
Assuming all the foregoing delays were excusable, the extension of the delivery schedule made adequate allowances therefor. These were not causes occurring subsequent to agreements establishing a new delivery schedule and therefore cannot be cited as causes for nonperformance.
*****
The asbca finding that parts sufficient to make up a pilot lot “were completed by the end of July” is not supported by the record before this court, if by “parts” the asbca meant acceptable parts. Although there is conflict in the testimony in this regard, the preponderance of the evidence fairly shows that the correct date of plaintiff’s completion of acceptable parts for the pilot lot was September 8, 1955. The correctness of the September 8 date is clearly indicated by the fact that, on that date, plaintiff’s chief inspector signed a form acknowledging receipt from a subcontractor of the newly plated pilot lot components. Furthermore, in its comments on plaintiff’s requested findings of fact, plaintiff now appears to have accepted the September 8, 1955 date as the correct completion date.
After the resident inspector had completed his inspection, plaintiff shipped the pilot lot to its packaging subcontractor on October 7, 1955, who, in turn, shipped the pilot lot to Frahkford Arsenal for final inspection on October 10,1955. By letter dated October 21, 1955, the plaintiff was notified of the acceptance by the Ordnance Corps of the submitted pilot lot subject to certain specified corrections.
*902 The delay of which plaintiff now complains, namely, from September 8, 1955 to October 7, 1955, was due to a combination of slow inspection by the resident inspector and to the reworking by plaintiff of defective parts. In addition, as found by the asbca, there was some delay during this period in obtaining from plaintiff’s subcontractor certifications of plating as required by Frankford Arsenal. Plaintiff was unable to prove what damage, if any, resulted to it from the slow inspection by defendant’s resident inspector which partially contributed to the one-month delay. Its hypothesis that its damage could be measured by an assumed interest rate of two percent per month applied to the amount previously expended on the contract is entirely speculative.
12. After the Ordnance Corps had indicated its acceptance of the pilot lot, plaintiff commenced work on its production lots. By this time, of course, it was already behind the contract delivery schedule, but on October 26, 1955, it fore-casted that it would be able to deliver 316 units by November 17, 1955, another 316 units by December 17, 1955, and the balance by January 16,1956. On December 16,1955,’ following several visits to plaintiff’s plant by Ordnance Corps personnel, the Philadelphia Ordnance District sent the following letter to plaintiff:
Under date of 9 September 1955, this office wrote your office indicating that a revised schedule, as f ollows, would be recommended:
Pilot Lot — September 1955
316 — 30 days after acceptance of Pilot Lot
316 —60 days after acceptance of Pilot Lot
Balance — -90 days after acceptance of Pilot Lot
The letter requested advice if your facility desired to take exception. No exception, however, was taken to this letter.
The above-referred-to Pilot Lot was sent to Frank-ford Arsenal for approval on 10 October 1955.
Under date of 26 October 1955, this office confirmed conversation with your facility indicating your approval to proposed schedule as follows:
316 ea. by 17 November 1955
316 ea. by 17 December 1955
Balance by 16 January 1956
*903 No exception was taken in writing to the above, and all concerned were advised of the above schedule.
As of this writing, no deliveries have been made under the contract with the exception of the Pilot Lot. Latest information received indicated component parts for 316 end items would be in the hands of the Resident Inspector by 16 December 1955. This, however, has not been accomplished.
This office is under constant pressure to have delivery made of these items and the Service ultimately receiving this material is greatly hampered by nonreceipt of the item.
Request reply by return mail as to exact status of this order and a definite delivery date for the first 316 Units due.
Representatives of this office will visit your facility to discuss the matter in detail, and it is requested a detailed report be made available indicating exact status of the component parts.
On January 27, 1956, plaintiff made its first post-pilot lot shipment by delivering 48 thrusters to Frankford Arsenal.
13. On February 3,1956, plaintiff shipped its second post-pilot lot of 96 thrusters. Upon the arrival of this second lot at Frankford Arsenal, it was determined by Ordnance Corps personnel that the breech and body assembly was too tight on virtually all of the units comprising the first and second post-pilot lots. In a conference with Ordnance personnel, plaintiff’s representatives agreed to rework 143 of these units as a favor and on a “no-charge” basis. On March 16,1956, the 143 units were returned to plaintiff from Frankford Arsenal, reworked by plaintiff, and delivered back to Frankford Arsenal on March 23, 1956.
On June 11,1956, plaintiff’s production manager prepared a status report for R. S. Harrison, Jr., plaintiff’s president. It read, in relevant part, as follows:
On March 16,1956, we received from the Arsenal 143 units to be reworked on the female thread of the Body P/N FA-29278. These pieces were reworked to verbal instructions from Mr. Frank Conlon of the Arsenal, not to a written rejection. Technically, it is possible to make this part to B/P and not accept the gages. These parts were reworked at no charge.
*904 Defendant’s witness, on cross-examination before the asbca, refused to say that the technicality referred to in the above quoted status report did in fact occur, and there is nothing in the record to support a conclusion that manufacturing to extreme tolerances did in fact occur with respect to the 143 units. Accordingly, it can not be said that the tight thread condition, which resulted in initial rejection of the 143 bodies, was attributable to design or drawing defects. Neither was there a connection between the tight thread condition found on the 143 units in the first two shipments and the error in the original drawings which had been corrected by September 8, 1955. See finding 7, supra. In addition, the record is clear that plaintiff expected no extra compensation for this rework on the threads of the 143 bodies and had so advised defendant at the time.
14. On February 16, 1956, plaintiff made its third post-pilot lot delivery by shipping 120 units to Frankf ord Arsenal. On March 16,1956, plaintiff shipped 204 units comprising, its fourth and last post-pilot lot delivery. This brought its total deliveries to 483 thrusters ;(including the 15 pilot-lot units). Thus, of the 1,031 thrusters required by the contract, there remained 548 to be delivered.
Mr. Atwood, the resident inspector at plaintiff’s plant, inspected all shipments made by plaintiff to defendant, and made no ob j ection to the units as ultimately delivered. However, in examining the thrusters delivered by plaintiff, Frank-ford Arsenal personnel noticed that 137 bodies had arrived with scratches on their outside anodized coating. In an effort to deliver the thrusters to the Air Force in the shortest time possible, and without first making a measurement inspection, the Arsenal stripped the anodized coating from these 137 bodies and reanodized them in its own shop. Upon completing this process, the 137 bodies were measured for the first time and were then found to be undersized in the area of the external threads. At this time it was also noticed that 79 sleeve ends and 119 breeches were defective.
On June 4, 1956, the 137 bodies, 79 sleeve ends, and 119 breeches were returned to plaintiff with the understanding that plaintiff would repair, replace, or submit deviation requests with regard to them. Plaintiff agreed that the de *905 fects in the sleeve ends and breeches were its responsibility, but contended that the undersizing with respect to the 137 bodies had been caused by the stripping operation conducted at the Arsenal. On June 12,1956, plaintiff submitted deviation requests to the Ordnance Corps with respect to the 137 undersized bodies and other deficient items.
By letter dated July 9, 1956, the Ordnance Corps responded to these requests and informed plaintiff that it could not accept a number of the deficient items, including the 137 bodies, but that the remainder of the deficient items would be accepted. Plaintiff was thereupon required to manufacture 137 new bodies, which, after completion, were sent to Frankford Arsenal on November 20,1956.
The testimony of the expert witnesses with respect to the effect of a reanodizing operation is in conflict, but the preponderance of opinion is that the stripping operation can adversely affect precision dimensions.[5] Since the Arsenal stripped the parts without taking prior measurements, and since defendant’s resident inspector had previously approved the parts, the inference is warranted that the undersizing of the external threads on the 137 bodies was caused by the stripping process conducted at Frankford Arsenal. Although one dimension on these bodies was found to be slightly oversized after being processed by the Arsenal, this same dimension could still have been reduced dimensionally (by the Arsenal’s stripping operation) from a larger initial oversized measurement.
It is concluded that the undersizing of the external threads on the 137 bodies was caused by the stripping process conducted by Frankford Arsenal, and cannot be attributed to any fault or negligence on the part of plaintiff. The record reasonably establishes that plaintiff suffered damages in this respect amounting to $356.20.
15. Plaintiff has a number of complaints concerning defendant’s inspection procedures under the contract. They are directed particularly to those procedures followed by *906 defendant’s resident inspector, Nelson D. Atwood. The facts surrounding each complaint are set forth below, seriatim.
(a) Initially, Atwood refused to inspect any lot of thrusters smaller than an inspection lot of 300 thrusters, and plaintiff alleges that this was an unreasonable requirement by the inspector which delayed plaintiff in its performance and unduly increased its costs. In this regard the pertinent provisions of the contract (not already quoted in finding 4, supra) are as follows:[6]
4. SAMPLING, INSPECTION AND TEST PROCEDURES
4.1 lot — A lot shall consist of 300 thrusters, maximum, exclusive of test samples. A smaller quantity may constitute a lot at the discretion of the inspector. A lot of shear pins shall consist of 1000, shear pins, maximum.
% # sfc
4.2 INSPECTION
4.2.1 Inspection shall be as specified in Specification mxl-g-2550.
4.2.2 dimensional — All parts of the thruster shall be given 100 percent dimensional inspection by the manufacturer. All parts not conforming to the dimensions specified on the drawing shall be rejected.
*****
31. contractor’s inspection system. The contractor shall maintain a system of inspection adequate to assure that every piece and portion of the lot conforms to the requirements of the drawings and specification. If the inspection is inadequate, as evidenced by an excessive proportion of rejection at any time, the inspector may refuse to continue his inspection until the material has been again inspected by the contractor, and the contractor’s inspection procedure has been improved.
❖ * * * ❖
36. INSPECTION LOTS.
a. Size. Unless otherwise specified, material and parts shall be submitted for inspection in lots or sublots of sizes satisfactory to the inspector.
* * * *
*907 The general inspection procedure established under this contract is known as a “sampling” procedure. Under this procedure, the inspection of a contractor’s production lot is accomplished by the inspection of a sample therefrom only rather than by inspection of each unit contained in the lot tendered for inspection. Such sampling was prescribed in this contract (instead of 100 percent inspection) in order to avoid excessive inspection fatigue and to keep Government inspection costs at a minimum. Atwood refused to inspect lots consisting of less than 800 thrusters, thus adopting the maximum lot set forth in paragraph 4.1 quoted above. He refused to exercise the discretion given him, by said paragraph 4.1 to inspect a smaller quantity because he felt that the inspection of lesser quantities would amount practically to 100 percent inspection, thereby shifting the inspection burden from the plaintiff to the Government, and because he did not have an adequate bonded area available in which to segregate inspected parts. Plaintiff’s inspection personnel complained about Atwood’s position in this matter and contended that Government inspection of lots smaller than 300 units would have allowed plaintiff to correct its manufacturing problems, thus expediting the manufacture and assembly of the thrusters. Eventually, because of the urgent need of the Air Force for thrusters, the Ordnance Corps in December 1956 overruled Atwood and agreed to inspect any size lot of component parts presented by plaintiff for inspection. In addition, the Government abandoned the sampling method of inspection, assigned five additional inspectors to plaintiff’s plant, and commenced a 100 percent inspection of all component parts. While Atwood’s refusal to inspect smaller lots than 300 thrusters may be characterized as a rigid position, he in no way exceeded his authority or violated the inspection requirements of the contract.
(b) Plaintiff’s inspection personnel complained that Atwood repeatedly refused their requests for an “in-process” or “informational” inspection of component parts during the course of manufacture. Plaintiff alleges that such “in-process” inspection was an established trade practice and that Atwood’s refusal to conduct such inspection unreasonably delayed plaintiff and increased its costs. The Chief of the *908 Quality Assurance Section of Cartridge Actuated Devices at Frankford Arsenal testified that a contractor’s request for a reasonable number of such informational checks ought not to be refused by a Government inspector. In fact, inspectors, other than Atwood, who were assigned to this contract in its later stages, did make such informational or in-process inspections. However, the contract clearly did not require such inspections, and even though Atwood’s refusal in this regard may be characterized as unreasonable and uncooperative, plaintiff has failed to show wherein it was damaged thereby or that it could not have overcome the inspector’s negative attitude simply by conducting an efficient 100 percent inspection on its own, as required by the contract.
(c) Plaintiff complains that, hi violation of standard practice, Atwood consistently conducted his inspections by using a “no go” gauge prior to the “go” gauge, and that in so doing Atwood damaged component parts which had to be reworked by plaintiff. A “go” gauge is an inspection device used to determine whether a particular measurement on the part being inspected is the same or not smaller than the tolerances specified by the blueprint. A “no go” gauge, on the other hand, is used to determine whether such measurement is larger than the blueprint tolerances. Assuming that these gauges are used properly, it makes no difference which one is used first. Obviously, the “no go” gauge should be used with care and not forced into the part under inspection. Forcing a “no go” gauge into the part with undue pressure is likely to cause a burr or burnish mark at the point where the gauge is stopped, and such damage will prevent an acceptable subsequent test by the “go” gauge in cases of close tolerances. There is testimony in the record that on several occasions Atwood was observed to use the “no go” gauge in such way as to damage the part and thus cause a subsequent rejection thereof. However, plaintiff did not endeavor to show either how many times this may have occurred or the extent of its damage therefrom, if any.
(d) Plaintiff complains that Atwood was unfamiliar with an inspection device known as a “comparator” and that, by reason of his unfamiliarity with the device, he erroneously *909 rejected 100 pistons for the thruster with the result that plaintiff reworked the pistons to finer tolerances than actually were required by the drawings. The record establishes that Atwood was not himself skilled in the operation of a comparator although he had witnessed the use of such a device on previous occasions. His lack of personal experience with the comparator caused an erroneous rejection of 100 pistons, but plaintiff has not shown on this record any specific amount of damage resulting to it from this inspection failure.
16. By the end of March 1956, the plaintiff had delivered to Frankford Arsenal a total of 488 thrusters, all of which had been accepted and paid for by defendant. Shortly thereafter, in the course of examining a breech component, inspector Atwood arrived at the conclusion that the interior opening within the breech had not been plated. He communicated this suspicion to Frankford Arsenal personnel who thereupon cut open one of the breeches previously manufactured by plaintiff. It was found that Mr. Atwood’s conclusion was correct and that, in fact, the interior of the breech had not been plated. During previous inspections, it had been assumed by the inspector that the small interior opening within the breech had been plated because plaintiff had furnished certificates from its subcontractor to the effect that the plating required by the specifications had been accomplished.
Plaintiff agreed that the interiors of the breeches manufactured by it had not been plated by its subcontractor, but it contended that such plating was not required either by the drawing or by the specifications. The drawing for the breech specified that it should have protective finish of “Type I, class T.S.C. (Cadmium Plate) Spec. 57-0-2 * * *” There was no exception entered on the drawing to eliminate the breech interior from the plating requirement. However, plaintiff pointed to the fact that the breech interior could not be touched with a sphere three-quarters of an inch in diameter and therefore claimed an exception under the following paragraph of Specification 57-0-2:
E-le. Thickness. Unless otherwise specified the minimum thickness of plating on significant surfaces shall be as given in Table I. Significant surfaces (See para *910 graph H-7), for thickness determinations only unless otherwise specified, are those parts of the visible surfaces that can be touched with a sphere ■% inch in diameter.
The defendant, however, considered that the quoted specification related only to the required thickness of the plating and did not justify complete elimination of plating. Accordingly, in May 1956, defendant notified plaintiff that no more thrusters would be accepted by defendant if they were un-plated in the breech interior.[7]
There is conflict in the testimony with respect to trade practices in the plating industry where a small interior surface, such as this one, is involved. The weight of such testimony, however, favors the conclusion that an instruction on the drawing or in the specification requiring a protective coating or plating applies to the entire part, including small interior surfaces; to eliminate such interior surfaces from the plating requirement would necessitate a specific exception stated on the drawings or specifications. Accordingly, since here no exception was stated, it is concluded that plating of the breech interior was a contractual requirement in this case.
When notified that all future breeches must be plated in the interior, plaintiff was also requested to submit a deviation request covering the 483 thrusters already accepted and paid for without such plating. However, plaintiff declined to submit such deviation because it thought such action might be construed as an admission on plaintiff’s part that plating was in fact required by the contract. Despite the relatively minor problem involved,[8] and in apparent disregard of the *911 requirements of tbe “Disputes” clause, plaintiff simply-abandoned the production of new parts.[9]
With, respect to the above described dispute, the asbca correctly found as follows:
Appellant argues that there was a mutual interpretation by the parties that plating was not required inside the breeches as the 483 end items were accepted and shipped without this requirement. The answer to this is that the thrusters were accepted and shipped on certification by the subcontractor that they were plated and anodized in accordance with the specifications. Not until later breeches were checked by Government inspectors for this purpose was it realized that the plating on the inside was missing. This discovery was made after appellant had practically discontinued further fabrication of end items. If appellant was of the firm opinion that the requirement was beyond the provisions of the specifications, it nevertheless would not be justified in ceasing further performance on that account but would be under obligation to comply with the contracting officer’s demand, meanwhile resorting to the “Disputes” procedure for ascertainment of its rights. Appellant appears to argue that it was so financially bereft from causes attributable to the Government and the flood that this plating requirement of the Government was, in effect, “the wall which brought the performance of this contract to an end.”
Assuming, without deciding, that there was an impairment of appellant’s resources rendering performance impossible, this would not constitute excusable cause unless the impairment was attributable to Government action or causes beyond appellant’s control and without its fault or negligence. Appellant has failed to so prove.
17. On August 24, 1956, representatives of the Ordnance Corps visited plaintiff’s plant and ascertained that no progress was being made on the contract. An inspection of parts completed by plaintiff showed only a portion thereof to *912 be acceptable. On August 27, 1956, the contracting officer transmitted the following letter to plaintiff:
You are notified that since you have failed to perform Contract No. da-36-038-ori>-19235 within the time required by the terms of the contract, the Government is considering canceling said contract pursuant to General Provisions 11 entitled “Default”. _
_ It is requested that you submit to the undersigned Contracting Officer within ten (10) days from the date of receipt hereof, any facts or circumstances which you believe excuse your failure to perform.
Your attention is invited to the respective rights of the Contractor and the Government under General Provisions 11 entitled “Default” and the penalties which may be involved in the event the decision is made to terminate your right to proceed.
Plaintiff responded by a letter dated September 6, 1956, in which its problems with the work under the contract were discussed at length. Plaintiff concluded its response as follows:
* m * * *
Along with our $25,000.00 loss from flood damages and result in [sic] loss on jobs of our other. customers, due to the same condition, we have a net loss involved in the company in the last ten months of close to $75,000.00 which has put us very close to bankruptcy, we are struggling to hold our company together. If the Government elects to declare us in default and exact a penalty, we will be forced to go out of business.
We have only one solution to offer and we wish to ask your consideration and that is, that the Contract be terminated at no cost to the Government and also at no cost to H & H Manufacturing Company, Inc. We will take our loss and realize that it will take us another year or two to put our Company back on its feet. The parts that we have on hand and those that could be salvaged, we would request permission to sell to your other Vendor now working on this assembly.
ijc iH ❖ ❖ ❖
Following receipt of plaintiff’s letter of September 6,1956, a conference was held at plaintiff’s plant. Plaintiff informed the Ordnance Corps that it would be physically and financially impossible for plaintiff to complete the contract. The only further work which plaintiff considered it would be *913 able to proceed with on the contract was the reworking of the 137 bodies, and other parts previously returned by Frank-ford Arsenal. Plaintiff agreed to return these reworked parts by November 15, 1956. Plaintiff further agreed to write a letter to Ordnance stating that it could not continue work on the contract. Accordingly, in a letter to the Ordnance Corps dated October 22, 1956, plaintiff stated in pertinent part:
:J: sj: # #
As we stated in our meeting, our financial position is precarious and because of the definite lack of working capital incurred by our heavy loss of this past year, it would be impossible for us to reschedule the balance of the items due on this contract. We will, however, complete the three (3) items which were returned for rework, and shall endeavor to have them in your hands on or before November 15.
V íf! í{i
* * * It is going to be a long, hard pull to try and save this business and we sincerely hope that you will be in a position to terminate this contract as outlined in our previous letter.
❖ sjs ifc ‡
■18. On December 10, 1956, the contracting officer issued formal findings of fact setting forth the negotiations regarding plaintiff’s performance, and pointing out that the delivery date for all thrusters required had not been extended beyond March 16,1956. The contracting officer then concluded:
* * # * *
13. Based upon the above Findings of Fact, I hereby determine that the contractor having delivered only 483 acceptable units under the contract, which called for 1031 units, is therefore in default as to the remaining 548 units and that said default is not due to any circumstances that would amount to an excusable delay.
14. In accordance with the above Determination and Findings of Fact, the Contracting Officer hereby terminates Contract No. da-36-038-ord-19235 for default..
15. In the event the supplies called for under subject contract are repurchased by the Government from other' sources, your company will be held accountable and liable-for any excess cost incurred by the Government because-, of said repurchase.
*914 The contracting officer also notified plaintiff of its right to appeal his decision to the Secretary of the Army “* * * in accordance with the provisions of Clause 12, ‘Disputes’ of the above numbered contract.” Plaintiff exercised its right to appeal the decision, and the matter was then calendared for a hearing before the Armed Services Board of Contract Appeals. Following a full hearing, the asbca issued its decision denying plaintiff’s appeal and stating the following ultimate conclusion:
$ $ ‡ ‡ $
From the evidence as a whole we fail to find merit in appellant’s contention that the termination for default should be deemed to have been made for convenience of the Government. We are of the opinion, and so find, that appellant’s failure to perform was not the result of causes beyond its control and without its fault or negligence. In this respect appellant’s appeal must be denied.
* * # $ #
The foregoing finding is neither capricious nor arbitrary and is supported by substantial evidence in both the record before the asbca and before this court.

The Facts with Respect to Defendant's Gov/nterclaim

19. On October 11, 1956, a little over a month after plaintiff had proposed that its contract be terminated, the Ammunition Group Procurement Assignment Board of the Ordnance Corps convened its membership for the purpose of reviewing pending plans for the “urgent procurement” of 1,902 M3A1 thrusters. The minutes of the Board meeting read, in pertinent part, as follows:
The Board was reluctant to consider a recommendation for negotiation with one source of supply and investigated the possibility of utilizing additional sources for competitive procurement. It was found that the only other source (H. & H. Manufacturing Company, Incorporated) familiar with the manufacture of this item could not deliver under its present contract and termination proceedings were in process. (Contract da-36-038-ORD-19235.) It was therefore concluded that due to the minimum lead time and urgent delivery date negotiation with a facility in production offered the only practical solution.
*915 The Board noted that "considerable follow-np and administrative processing would be involved in this procurement, and warned that delays caused by administrative action would be inconsistent with the intent of a Public Exigency as defined in ASPE-3-202. The Planner was instructed to utilize telephone and teletype communication whenever possible to save time, and to set a target date for contract finalization no' later than 30 October 1956.
Eegarding the delinquent status of Contract da-36-038-obd-19235, it was recommended by the Board that a quotation for this quantity of 548 each also be solicited from thé American Optical Company so that a better price could be obtained for this small quantity now urgently required to meet minimum Air Force requirements. By this arrangement all urgent quantities can be obtained by the same action and repurchase costs held to a minimum.
The Board approved the request for negotiation under authority of Section 2(c) 2 of the Armed Services Procurement Act (ASPE and APP-3-202) and reminded the planner that a justification for the use of this authority must be obtained, and the file documented accordingly.
Based on the foregoing, concurrence for allocation to the Boston Ordnance District for negotiation with the American Optical Company, the only current producer was given.
According to the Chairman of the Board, it was thought that by including the 548 thrusters undelivered under plaintiff’s contract as a portion of a larger contract, repurchase costs would be held to as low a figure as possible. On October 23, 1956, Frankford Arsenal requested the Boston Ordnance District to obtain a quotation from the American Optical Company for alternative quantities Of 1,902 and 2,450 M3Ai thrusters. By this date, the M3A1 thruster being procured was to be manufactured pursuant to re-bp-40, Eev. 4, dated March 19, 1956, rather than to the “Eev. 3” under which plaintiff’s contract had been let. Accordingly, the Boston Ordnance District solicited a quotation on alternative bases. American Optical was asked to supply a per unit price solely for a quantity of 1,902 M3Ai thrusters manufactured pursuant to Eev. 4. As an alternative, a per unit price was requested for 1,902 M3Ai thrusters manufactured *916 .pursuant to Eev. 4 and 548 M3Ai thrusters manufactured pursuant to Eev. 3. American Optical Company’s per unit price for both alternatives' was the same, namely, $38.40. On November 28, 1956, American Optical was awarded Contract da — 19—o 2 o — ord—4 349 for a quantity of 1,902 M3A1 thrusters, pursuant to re-bp-4 o, Eev. 4, at a unit price of $38.40 which price was reduced through further negotiations to $34.90. As plaintiff’s contract was not terminated until December 10, 1956, no funds were available to add the 548 undelivered units under plaintiff’s contract to Contract da-19-020 — ord—4349 at the date of its award to American Optical. Plaintiff appears to have been aware that the undelivered units under its contract, in all probability, would be procured from American Optical, for it sought permission to contact that company with a view of disposing to it unused packaging materials in plaintiff’s hands. See finding 17, supra.
20. Four days after plaintiff’s contract had been terminated for default, the Ammunition Group Procurement Assignment Board again held a meeting for the purpose of considering the procurement by direct negotiation of the 548 M3A1 thrusters still undelivered under plaintiff’s contract and an additional quantity of 2,013 M3Ai thrusters required by the Air Force, or a total of 2,561 m3ai thrusters. For some time thrusters had been urgently required by the Air Force and were enumerated in the “Vital Items List” as an item “on which Air Force stocks shall be or will be depleted prior to the receipt of quantities sufficient to meet immediate requirements * * * the lack of which will retard vital Air Force programs.” The minutes of the Board Meeting read,, in pertinent part, as follows:
The M3Ai thruster appears on the “Vital Items List”' received from Wright Patterson Air Force Base under date of 13 December 1956. Deliveries at the rate of 250 per month beginning May 1957, in addition to the items currently on contract, are necessary to prevent line shortages in airframe plants. Since the administrative and production lead time for the furnishing of these items is seven (7) months, only a proven producer presr ently in production can meet the vital delivery require-: ments. Accordingly, procurement by negotiation" is found justified pursuant to the exception set out in 10- *917 TJSC 2304 (a) (2). Direct allocation will be made to the Boston Ordnance District for placement as a supplemental award with the Américan Optical Company under their present contract da-4349. It has been determined that the-American Optical Company has the additional productive capacity to meet the Air Force requirements. _ ;
_ Pursuant to the provisions of aspr-2-206.1 (IV), this procurement need not be publicized in the Department of Commerce publication “Synopsis of U.S. Government Proposed Procurement.”
Small business firms cannot be considered for this procurement since the urgency of the requirement necessitates awarding to the American Optical Company, a large business concern.
Based upon the foregoing, the contracting officer thereupon made his determination and findings to negotiate an individual contract under Title 10, U.S. Code, Section 2304(a) (2).
21. On December 28, 1956, the Ordnance Corps at Frank-ford Arsenal transmitted the procurement authority to the Boston Ordnance District by letter reading, in pertinent part, as follows:
1. This Arsenal has a requirement for an additional quantity of 2561 each, Thrusters, M3A1 which item is now being manufactured by the American Optical Company under Contract da-19-020-okd-4349. Your district is requested to negotiate solely with the American Optical Company for this urgent requirement and extend all efforts to meet the critical delivery desired.
2. Pursuant to the provisions of OPI 1-401.4 (b), this requirement is allocated to your district for negotiation and execution of a definitive contract with the American Optical Company. Minutes of the Procurement Assignment Board with appropriate Determination and Findings are inclosed.
Boston Ordnance District thereupon solicited quotations from American Optical. Again, as in the case of negotiations for Contract 4349, American Optical was requested to quote on thrusters under alternative bases depending upon whether the manufacture was pursuant to Rev. 4 or Rev. 3. As in the case of the preceding contract, however, American Optical again issued identical quotations under both alternatives, but at a lower figure, namely, $31.92 per thruster. To *918 that quotation^ American Optical also included, under either alternative, an additional cost of $2,479 for special tooling (gauges), thus raising the total unit price to $82.87.
The Price Analysis Branch of Boston Ordnance District thereupon conducted a detailed price analysis of the American Optical quotation, and concluded that the $82.87 constituted a, fair and reasonable price. Defendant’s contract negotiator made one final effort to obtain a price lower than $32.87 but had no success. Shortly thereafter, on February 28,1957, the Government and American Optical entered into Contract No. DA-19-020-ORD-44Í5, calling for the manufacture of 2,605 M3Ai thrusters under Kev. 4 at a per unit price, including, special tooling, of $32.87. The 2,605 thrusters thus contracted included replacements for the.548 thrusters plaintiff had failed to deliver under its contract, The price obtained by Boston Ordnance District under this new contract was $2.03 less per thruster than the previous price obtained under Contract No. da-020-okd-4349 with American Optical.
At the time of the reprocurement actions described above, American Optical Company was the only successful manufacturer of the M3Ai thruster then in production. Although there had been previously a small group of manufacturers who'had successfully fabricated thrusters,[10] American Optical was the only firm in production-at this time, and the Frankford Arsenal personnel reasonably believed that only American Optical was in a position to meet the urgent delivery requirements. ;
22. Despite the urgent need of the Air Force for thrusters, Contract No. 4415, as finally negotiated, allowed American Optical nearly 16 months within which to deliver and also permitted the manufacturing to be accomplished at American Optical’s plants' in Buffalo, New .York, and Keene, New Hampshire, which plants had not previously manufactured thrusters. This appears to have been due to the fact that American Optical’s experienced plant at Southbridge, Massachusetts was then fully engaged in production of thrusters under Contract No. 4349. Defendant’s contract negotiator, *919 however, anticipated that production of the thrusters at Buffalo and Keene would proceed smoothly by reason of "American Optical’s previous experience with thrusters coupled with its ability to interchange its technical personnel already familiar with the various manufacturing problems involved. Nonetheless, American Optical did not complete delivery until June 1958, and it was not until December 20, 1957, that its deliveries under the contract had exceeded even the 548 units terminated under plaintiff’s contract.
Meanwhile, on April 25,1957, the contracting officer under plaintiff’s contract issued his “Findings and Demand for Excess Costs” to plaintiff. The contracting officer found that 548 undelivered units under plaintiff’s contract had been reprocured at a unit cost of $32.87163, for a total cost of $18,013.65. The contracting officer further found that the cost to the Government for the 548 units, had plaintiff performed its contract, would have been $10,675.04 (548 units at $19.48. each). Excess costs were thus found to be $7,338.61, and the contracting officer issued his determination to this effect, coupled with a demand for payment and a notice that plaintiff could appeal his decision to the Secretary of the Army “* * * in accordance with the provisions of Clause 12, ‘Disputes’ of the numbered contract.” Plaintiff appealed the determination, and the matter was calendared for a hearing by the Armed Services Board of Contract Appeals.
23. On April 29, 1960, following a full hearing, the asbca issued its decision relating to the propriety of the reprocurement of the 548 thrusters, as described above. After stating in detail the events relating to the reprocurement, the asbca concluded, as follows:
In the peculiar facts of this case we find no impropriety in the Government’s repurchase action. There is no requirement that reprocurement be effected by competitive bidding, the means being discretionary with the contracting officer under the standard “Default” clause with which we are here concerned. * * *
In the instant case there was an urgent need for the contract item, a safety device to be installed on jet aircraft for use in the. ejection of pilots in emergency situations. It was fairly and reasonably determined *920 that only a proven, active producer could satisfy the vital delivery requirements. On appellant’s original procurement, the bidders who were successful in manufacturing the thruster other than appellant and Pan-tex, submitted bids that were higher than the reprocurement price. A more recent bid of Pantex was $61.68, almost double that of the repurchase figure. It was submitted in connection with the invitation which led to the award of contract No. 3723 to American Optical as low bidder at the unit price of $34.10 in September 1955, three or four months after the award of appellant’s contract. From the time of the award of contract No. 3723 American Optical continued to be a successful, reliable producer of the M3A1 Thruster at only slight variations in price, the repurchase contract having the lowest unit price of its four contracts with the Government.
Under the circumstances disclosed by the record, negotiation of the repurchase contract with American Optical was not only a proper course but the most desirable course from the standpoint of both production and price, especially when it was originally planned to add the repurchase items to contract No. 4349 which had just been recently awarded. In subsequently deciding to withhold final negotiation until a reduction in unit price was obtained on contract No. 4349, the Government acted with commendable foresight with the result that a lower figure was offered by American Optical in the repurchase negotiations.
Appellant readily admits that the Government negotiated the most favorable price that could be secured from American Optical. Its complaint is rather that the Government selected a high cost producer. We are convinced that the record reflects American Optical to be the lowest cost producer of established reliability in the fabrication of the M3Ai Thruster.
The asboa noted that deliveries by American Optical were not as fast as had been originally anticipated but the Board did not consider this fact to render the reprocurement defective in view of its finding that the Government had reasonably anticipated speedier deliveries. However, the Board did give weight to the fact that the reprocurement contract was awarded under Rev. 4, whereas plaintiff’s contract had been awarded under Rev. 3. The Board thereupon determined that the additional cost involved in the production of *921 Rev.-4 thrusters was approximately 85 cents per unit. The Board considered it “only equitable” that this additional cost should be taken into account in determining the amount of excess costs assessable against plaintiff. By giving plaintiff credit for 85 cents per unit additional cost under Rev. 4, the Board reduced the contracting officer’s assessment for excess cost from $7,338.61 to $6,723.96.
The decision of the asbca is neither capricious nor arbitrary and is supported by substantial evidence.
CONCLUSIONS OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that defendant is entitled to recover under its counterclaim the sum of six thousand seven hundred twenty-three dollars and ninety-six cents ($6,723.96). The court further concludes that plaintiff is entitled to recover only the sum of three hundred fifty-six dollars and twenty cents ($356.20) under the claim set forth in paragraph 13 of its petition,. and as to all other claims, the petition is dismissed. It is, therefore, adjudged and ordered that defendant recover of‘ and from plaintiff the net sum of six thousand three hundred; sixty-seven dollars and seventy-six cents ($6,367.76),

The de novo evidence in this court may properly be Considered under the rule of Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 237 F. 2d 861 (1963), and similar later decisions.

 In those few instances where certain issues presented here by plaintiff have not been treated by the asbca, the de novo record in this court supports the Board’s ultimate conclusion.

 In Its brief, defendant suggests that this “equitable” determination by the asbca may not be valid “as a strict matter of law.” Pointing to the fact that the contract merely requires the reprocured items to be “similar” to those specified under the defaulted contract, and referring to the holding of Associated Traders, Inc. v. United States, 144 Ct. Cl. 744, 750, (1959) that such a question is one of law for the court, defendant speculates that, in so reducing the excess cost figure, the asbca may be deemed by the court to have exceeded its authority. It does not appear, however, that defendant actually intends to raise this issue for decision since, in its requested findings of fact, it asks the court to sustain the asbca decision and to enter judgment on defendant’s counterclaim in the lower amount of $6,723.96. Accordingly, it would appear proper to treat the reference to Associated Traders, supra, as simply a thought ere passant.

 On September 27, 1955, the unit price was adjusted to $19.48 for a total consideration of $20,083.88, and was later further adjusted to $20,063.48. No ' changes were then made in the contract completion date.

 Since plaintiff acknowledged receipt of the additional prints on August 5, 1955, this finding appears to be in error.

 The asbca made no effort to resolve the conflict but contented itself with the observation that “Whatever the fact may be, the pieces were reworked * * *” Actually, as noted above, plaintiff built new bodies rather than reworking the old ones. According to plaintiff’s plant superintendent, the old bodies had to be scrapped.

 The quoted provisions are drawn from certain military specifications and the basis for procurement which were incorporated into Contract 19235 by reference. The referenced documents are be-bp-40, Revision 3, dated 1 April 1955, mil-g-2550, and hia-std-105a.

 The interior of the breech concerned compares roughly to the bore of a rifle. The firing pin is assembled into it and must travel down the bore to detonate the cartridge contained at the end of the breech. The area is subject to corrosion, especially because of temperature differentials and moisture condensation which occur during its use in aircraft operating from ground level to extremely high altitudes. Failure of the firing pin to detonate the cartridge in the thruster due to corrosion surrounding the pin, spring, and block assembly has been found to be the cause of one fatal accident involving Navy aircraft.

 Plaintiff’s vice president testified that there would be only a nominal additional cost involved in plating the breech interior. Also, of course, since the subcontract between plaintiff and its plating subcontractor required that the plating be performed according to specifications, any additional burden would not fall upon plaintiff.

 Plaintiff contends it was financially unable to proceed. By this time, plaintiff had expended over $40,000 in performing a $20,000 contract, and its certified public accountant had advised plaintiff’s management that, if the loss to complete the contract was as great as the loss to date, insolvency or bankruptcy would result.

 The prices charged per unit by these other manufacturers were all considerably higher than plaintiff’s price under the present contract.