The CHEMITHON CORPORATION

v.

UNITED STATES.

No. 302–80C.

United States Claims Court.

March 15, 1983.

Norman L. Winn, Seattle, Wash., for plaintiff; Smith, Brucker, Winn & Ehlert, Seattle, Wash., of counsel.

Beacham O. Brooker, Jr., Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Andrea Salloom, Gen. Services Admin., Washington, D.C., of counsel.

## OPINION

NETTESHEIM, Judge.

This case is brought to the court by petitioner Chemithon Corporation ("Chemi-

thon") on review of a decision of the General Services Administration Board of Contract Appeals ("GSBCA" or the "Board") under the Wunderlich Act. 41 U.S.C. §§ 321, 322 (1976). The contract in issue was performed in 1973 and 1974; trial was held in 1977; the Board's decision was issued on February 29, 1980; the matter was fully briefed by October 28, 1981; and the Court of Claims on December 4, 1981, referred the pending cross-motions for summary judgment to Trial Judge Roald A. Hogenson for a report on the facts and law. After subsequent reassignments, the case was assigned to this court by order entered on January 25, 1983. Thereafter, because the last brief had been filed 15 months earlier, the court entered its order on January 31, 1983, permitting the filing of supplemental briefs by February 28, 1983. Defendant made a submission. Oral argument was held by conference call on March 4, 1983. The court authorized plaintiff to file its supplemental brief after argument; this was received on March 14, 1983.

## BACKGROUND

The requirements contract in this case was awarded to Chemithon on April 20, 1973, to supply powdered hand dishwashing compound at $5.58 per 50-pound bag to the General Services Administration's ("GSA") Region X supply distribution facility for the period June 1, 1973, through May 31, 1974. GSA's estimated peak requirement was 500 bags per month, with a total of 4,200 bags projected during the contract term. Chemithon represented that its monthly supply potential was 5,000 to 8,000 bags. The contract provided that shipment was required within 45 days after receipt of a Purchase Order. Nine Purchase Orders for 6,243 bags were issued from July 11, 1973, to February 26, 1974. Purchase Orders 1, 2, 7, part of 8, and 9 were delivered and accepted. GSA terminated the contract for default due to non-tender as to the quantities covered by Purchase Orders 4, 5, 6, and part of 8. The third Purchase Order was termi-

nated for failure to tender for reinspection after rejection.

Upon reprocurement of the unfilled requirements, GSA incurred excess reprocurement costs of $18,463.91 thereafter assessed against Chemithon. The default terminations and the amount of excess reprocurement costs were appealed. The GSBCA converted the default termination of the third Purchase Order to a termination for convenience of the Government based on defective testing procedure and cancelled the assessment of reprocurement costs for that termination; sustained the termination for default of the fifth Purchase Order, but overturned the assessment of reprocurement costs because the Government failed to mitigate damages; and sustained the default terminations of the fourth, sixth, and part of the eighth Purchase Orders, reducing the amount of the excess reprocurements costs to $14,139.30, plus interest.[1] GSBCA No. 4525 (Feb. 29, 1980).

Chemithon seeks reversal of the Board's decision as to termination of Purchase Orders 4, 5, 6, and part of 8 and an equitable adjustment in the amount of $10,770.42, plus interest, with respect to Purchase Orders 3, 4, and 5, assigning errors of both fact and law to each termination and reprocurement. Seven separate arguments are advanced with respect to one or more of the Purchase Orders, which has complicated the analysis on review, because the GSBCA's decision dealt with each termination individually, as well as the two reprocurements at issue. In its cross-motion, the defendant attempted to resurrect the Board's treatment of the terminations, but was required to abandon that approach and address each of the seven arguments when Chemithon in its opposition refused to conform to the Board's approach.

## FACTS

One of the key raw materials in Chemithon's hand dishwashing product was linear

1. The Board also denied Chemithon's appeal on its claim for palletization costs, which Chemithon does not raise in this court.

alkyl benzene, a petroleum derivative. Due to the world-wide oil shortage precipitated by the 1973 oil embargo, linear alkyl benzene was in short supply during the contract period.[2]

Purchase Order 3 was received on August 30, 1973, for 484 bags of compound. A delivery date of October 17, 1973, was called for. Chemithon did not meet the October 17 delivery date and tendered for inspection the compound called for by that Purchase Order on October 23, 1973, which was rejected on October 29. The compound was again rejected on November 2. A ten-day show-cause letter was issued on December 10, 1973. The contract was terminated on January 16, 1974, for failure of Chemithon to submit the compound for reinspection after the November 2 notice of rejection.

Purchase Order 4, for 614 bags of compound, was received on November 12, 1973. Delivery was called for on December 28, 1973, and Chemithon did not meet this delivery date. The contracting officer issued a ten-day show-cause letter to Chemithon on January 29, 1974, which also covered the fifth and sixth Purchase Orders. All three Purchase Orders were terminated on February 19, 1974.

Purchase Order 5 was received on November 27, 1973, for 400 bags of dishwashing compound which were due on January 14, 1974. GSA issued a letter dated January 29, 1974, preliminary to terminating that Purchase Order for non-delivery. Chemithon explained in letters dated January 30 and 31, 1974, that the reason for the delay with respect to this order was its failure to obtain timely deliveries of the necessary raw materials. GSA did not consider the explanation adequate and, on February 19, 1974, terminated Chemithon's right to proceed with delivery of the compound called for by the fifth Purchase Order, as well as numbers 4 and 6. In the meantime, Chemithon, in late January, had tendered delivery under Purchase Order 5,

but the GSA inspectors did not make inspection.

By early October 1973 (before Purchase Orders 4 and 5 were issued), Chemithon was having difficulty in meeting its obligations to furnish up to 500 bags of compound monthly. The initial due date of October 17, 1973, for Purchase Order 3 was already approaching when belated delivery was made on Purchase Orders 1 and 2 on October 12 and 23. Notwithstanding the rejection of the late-delivered Purchase Order 3 on October 29, 1973, the contracting officer issued Purchase Orders 4 and 5 on November 8 and 25, 1973, calling for delivery of 614 and 400 bags, respectively, by December 28, 1973, and January 14, 1974. Then, on December 3, 1973, Purchase Order 6 was issued for 481 more bags of compound and received on December 6. Delivery of this shipment was scheduled for January 22, 1974. The January 29, 1973, ten-day show-cause letter applicable to the fourth and fifth Purchase Orders also advised that the sixth order would be terminated, and rejection ensued for all three orders by the letter of February 19, 1974.

Purchase Order 7 next was received on January 15, 1974, for 700 bags of compound to be delivered on March 4, 1974. As of the date this Purchase Order was issued, almost 2,000 bags were on order, with delivery delinquent under Purchase Orders 3, 4, and 5 and with prospects of delinquency of Purchase Order 6. Purchase Order 8, received on January 28, 1974, less than two weeks after Purchase Order 7, called for delivery of 1,500 bags on March 15, 1974. After show-cause letters issued on March 15, 1974, these orders were extended, and the seventh was filled on July 23, 1974.

Four-hundred bags were delivered under Purchase Order 8, after another extension and show-cause letter, but not until August 27, 1974. The order was partially terminated as to 1,100 bags on July 30, 1974.[3]

---

2. An adequate supply of sodium sulfate also became problematic, but for reasons not apparent in the record.

3. Chemithon concedes that compound produced under the third Purchase Order was applied to this order.

Reprocurements were made against the fourth, fifth, and sixth Purchase Orders on April 9, 1974, and against the deliveries due on Purchase Order 8 on August 23, 1974. The low bidder on negotiation provided compound at $11.00 on the second reprocurement and $13.00 on the third, as compared with the $5.58 original contract price.

Chemithon first challenges as legally erroneous the default termination of Purchase Order 5 on February 19, 1974. Based on the letters of January 30, and 31, 1974, from Chemithon's president and plant manager, respectively, stating that 400 bags (the amount called for by the fifth Purchase Order) were ready for inspection on February 1, 1974, the Board concluded that GSA was obligated to mitigate Chemithon's damages by accepting a shipment made available prior to the date of reprocurement. Before this court, however, Chemithon cites as legally erroneous the Board's conclusion that the default termination was proper based on its finding that Chemithon had not tendered delivery before termination on February 19, 1974, and argues that the termination should be converted to one for convenience with a corresponding equitable adjustment in Chemithon's favor.

The second argument is that substantial evidence does not support the Board's finding that Purchase Order 4 for 614 bags was not tendered prior to termination, although concededly tendered after the due date. The third argument is that the Board committed legal error by failing to award Chemithon an equitable adjustment with respect to the third through fifth Purchase Orders.

Chemithon next argues that denial of the right to withhold production of the sixth order, for 481 bags, was legally erroneous, because the Government had refused to take 1,570 bags of dishwashing compound produced to satisfy the third, fourth, and fifth Purchase Orders, and therefore Chemithon would have produced number 6 at its peril. The fifth contention is that the Board erred as a matter of law in ruling that the second procurement against Purchase Orders 4, 5, and 6 was reasonable.

According to Chemithon, GSA should have purchased its stock on hand, and the Government failed to justify the large procurement price increases.

The sixth argument relates to Purchase Orders 4, 5, 6, and part of 8. Arguing that GSA had a duty to advise Chemithon as to its national defense priority rating for raw materials and to assist in locating additional sources of materials, Chemithon cites as both legally erroneous and lacking substantial evidence the Board's decision that Chemithon failed to prove that timely production under each purchase order was impossible. Chemithon finally charges that the Board's decision regarding the reasonableness of the two reprocurements was legally erroneous based on the price differential between the original contract price and the second (Purchase Orders 4, 5, and 6) and third (part of 8) reprocurements.

## DISCUSSION

■ The Court of Appeals for the Federal Circuit in *Teledyne Lewisburg v. United States,* 699 F.2d 1336 (Fed.Cir.1983), endorsed Judge Spector's formulation of this court's role in a Wunderlich Act review, 699 F.2d at 1353–54, which need not be reiterated here, except to repeat the principles counseling restraint that the Board's decision shall be accorded finality if it is supported by substantial evidence and that legal conclusions can be reexamined by this court. 699 F.2d at 1354 & n. 59. Chemithon attempts to invite plenary consideration of its arguments by characterizing several of the factual determinations as legal. In considering Chemithon's challenges to substantial evidence in the record (including challenges mischaracterized as legal), the court has read the transcript of the five-day hearing and reviewed the exhibits and has not made any additional factual findings, because the Board did not fail to make any relevant findings of fact as to which the evidence is undisputed and because there is no disputed evidence calling only for one finding of fact. *Maxwell Dynamometer Co. v. United States,* 181 Ct.Cl. 607, 631 & n. 17, 386 F.2d 855, 970 & n. 17 (1968). However,

on certain questions—particularly the evidence supporting the reasonableness of the reprocurements—the court has given more weight than the Board to unequivocal evidence. This is not impermissible, because the trial judge did not participate in the Board's decision (which may have foreclosed consideration of certain evidence the judge discredited on credibility grounds) and because the Board made findings on point.

*Termination of the Fifth Purchase Order for Non-Delivery*

Chemithon contends that it tendered the fifth Purchase Order for 400 bags prior to the date of termination, February 19, 1974. The Board specifically found no evidence that Chemithon tendered the fifth order prior to the scheduled delivery date. GSBCA No. 4525 at 13. The Board's recitation of the facts amply supports this finding. The Purchase Order was due for shipment on January 14, 1974. A December 3, 1973 letter from Chemithon's president to GSA's supervisory quality assurance specialist ("QAS") stated that Chemithon had received an order for 400 bags which it could not fill. This view was reiterated in his letter to the contracting officer on December 14, 1973, indicating that Chemithon was unable to fulfill Purchase Order 4, as well. On January 2, 1974, Chemithon's president wrote the contracting officer that Chemithon intended to produce 400 additional bags during January; the earliest notice of record that 400 bags indeed had been produced was the president's January 30, 1974 letter to the contracting officer stating that the 481 bags under Purchase Order 3 were awaiting inspection. The ten-day show-cause letter that issued on January 29, 1974, was signed on January 30, 1974. In response Chemithon's plant manager advised by letter of January 31 that the fifth Purchase Order would be ready for inspection on February 1, 1974.

The Board accurately summarized the conflicting testimony[4] as to whether oral notice was given and received that Purchase Order 5 was ready for inspection in early February. GSBCA No. 4525 at 5, 6. In summary, GSA's QAS was told by Chemithon's plant manager that the order would not be ready for inspection in early February because of the problem with the spray drying tower, and the former did not recall receiving telephone calls that this order was ready for inspection. Chemithon relied on its records that 1,570 bags were ready for shipment on January 29, 1974, and testimony by the plant manager that he telephoned both the QAS and his supervisor to arrange for inspection in early February. On February 11, 1974, the contracting officer talked with the QAS, who reported (and testified directly) that he had not received any word that the bags were ready. The Board noted that by letter of February 20, 1974, Chemithon's president wrote the contracting officer that he had notified the inspector on several occasions that the fifth order was ready for inspection.

Following the February 19 termination, the contracting officer on February 21 issued a statement of findings and determination that a serious back-order situation existed for each of the fourth, fifth, and sixth Purchase Orders, noting that Region X was in a serious back-order situation and that no stock was available to be issued, and ordered competitive negotiations for reprocurement of these orders.

While not excusing Chemithon's late tender, the Board found that 400 bags for the fifth Purchase Order were ready for delivery by the end of January within the ten-day period (Chemithon admits that no evidence established the exact date of production) and that the Government was unable to establish the contrary. GSBCA No. 4525 at 14. However, the Board upheld the Government's determination for default on account of late delivery, citing *Midway Electric Supply Co.,* GSBCA No. 1420, 65–2 BCA ¶ 4,929, and *Aargus Poly Bag,* GSBCA

4. Its decision on point did not turn on credibility because the hearing officer did not participate in the Board's decision.

Nos. 4314, 4315, 76–2 BCA ¶ 11,927.[5] GSBCA No. 4525 at 13.

The cases relied on by Chemithon are distinguishable. In *Superior Fuse & Manufacturing Co.,* GSBCA Nos. 7752, *et al.,* 63 BCA ¶ 3,639, appellant obtained copies of letters that instructed government inspectors not to inspect or approve for shipment items offered after a show-cause letter issued. *Id.* at 18,289. The Government in *Methode Electronics, Inc.,* ASBCA Nos. 12886 & 12916, 68–1 BCA ¶ 7,065, requested the contractor to set a new delivery schedule and accepted partial late deliveries under the same order.

There is no evidence here, as present in *National Farm Equipment Co.,* GSBCA No. 4921, 78–1 BCA ¶ 13,195, where the government inspector acceded to the contractor's statement that the items would be ready for inspection two weeks after delivery, that GSA extended the time for inspection on this Purchase Order. *Accord, Fred Schwartz,* ASBCA No. 23183, 80–1 BCA ¶ 14,272 (contracting officer orally granted extension of a cure date).

Chemithon also relies on *B & C Janitorial Services,* ASBCA No. 11084, 66–1 BCA ¶ 5,355; *Moses Wade,* ASBCA Nos. 6955 & 7148, 62 BCA ¶ 3,438; and *Shreveport Laundry Inc.,* ASBCA No. 3057, 56–2 BCA ¶ 1,008, all of which involved true cure periods wherein the contractor was requested to remedy a deficiency in the varying periods and did so. *Introl Corp.,* DOT CAB No. 1030, 80–1 BCA ¶ 14,380 disallowed termination before the contractor responded to the show-cause letter within ten days from receipt, but termination here took place 20 days after Chemithon responded.

In any event, *Aargus* represents the majority view which permits termination any time after the due date for delivery, even though the contractor is permitted to show excusability after the due date. 76–2 BCA ¶ 11,927 at 57,184; *see Continental Chemical Corp. v. United States,* 203 Ct.Cl. 711 (1973) (agreeing to test a substitute delivery during the show-cause period constitutes a prospective willingness to waive default).

The Board correctly held that GSA could terminate after the due date irrespective of Chemithon's activities during the ten-day period.

*Termination of the Fourth Purchase Order for Non-Delivery*

This is hybrid law-and-fact argument, because Chemithon relies on the same law on tender as Purchase Order 5, but contends additionally that substantial evidence supports a finding that Purchase Order 4 was produced before termination. The Board's findings on point were that Chemithon's three January letters gave no indication that the 614 bags called for by the fourth Purchase Order had been produced and were ready for inspection, noting that the record was unclear whether the fourth Purchase Order ever was produced and identified to GSA's contract. GSBCA No. 2545 at 14–15. The record amply supports these findings.

The first mention of the fourth order is in the president of Chemithon's February 20, 1974 letter to the contracting officer that notice had been given previously that the fourth Purchase Order was ready for in-

---

**5.** Both this case and *Aargus* involve the same standard default clause and waiver provisions. The latter reads:

None of the following shall be regarded as an extension, waiver, or abandonment of the delivery schedule or a waiver of the Government's right to terminate for default: (i) Delay of the Government in terminating for default; (ii) Acceptance of delinquent deliveries; and (iii) Acceptance or approval of samples submitted either after default in delivery or in insufficient time for the contractor to meet the delivery schedule.

Any assistance rendered to the contractor on this contract or acceptance by the Government of delinquent goods or services hereunder, will be solely for the purpose of mitigating damages, and is not to be construed as an intention on the part of the Government to condone any delinquency, or as a waiver of any rights the Government may have under subject contract.

GSA Supplemental Provisions to Standard Form 32, art. 11(b).

spection.[6] In contrast, the three January letters (January 2, 30, 31) stated that Chemithon could produce, and had produced, only 400 bags. The fourth Purchase Order preceded the fifth, calling for a due date two weeks before the fifth Purchase Order. The record thus lacks consistent evidence that Chemithon had produced more than 400 bags required to fill the fifth order as of the end of January 1974. It is true that Chemithon's Exhibit 125 indicated that at the end of January, 1,570 bags were on hand to fill orders 3, 4, and 5, and the Board credited this exhibit, GSBCA No. 4525 at 6, which was authenticated by Chemithon's president. Thus, the Board was justified in concluding that the same individual had an opportunity to notify GSA of the availability of this order in his January correspondence[7] and did not do so.

As a result, the Board could conclude that Chemithon failed to tender delivery of the fourth Purchase Order within the timeframe during which the Board concluded the fifth order was made available in mitigation of GSA's damages.

*Award of an Equitable Adjustment with Respect to Purchase Orders Three, Four, and Five*

Having failed to demonstrate that the Board's determination upholding termination of Purchase Orders 4 and 5 is either legally incorrect or unsupported by substantial evidence, plaintiff's claim to an equitable adjustment with respect to these terminations will not be considered further. The Board determined that due to improper testing procedure, the default termination of Purchase Order 3 was unjustified and converted it to a determination for convenience of the Government.

The Administrative Judge admitted Exhibit 131 setting fourth Chemithon's claimed damages and, over Government counsel's objection, ruled that the damages were in issue and that the Board could determine quantum, although proof of damages had not been submitted to the con-

tracting officer for his initial consideration. With respect to Purchase Order 3, storage costs of $358 were sought; bagging, $242; and attorneys' fees, $3,026—for a total of $3,626.00.

After the Board's decision which did not allow this adjustment, Chemithon, on January 28, 1981, submitted to the contracting officer its claim for an equitable adjustment with respect to the third and fifth Purchase Orders (the latter not having been the subject of a termination for convenience) and on April 15, 1981, a completed Settlement Proposal Form. The contracting officer denied the claim on May 14, 1981, on the ground that because the Government later accepted the 484 bags covered by Purchase Order 3 under the same contract (admitted by Chemithon), no proof was presented that storage, rebagging, and related interest were incurred. The claim for legal expenses and related interest was denied as disallowed costs incurred as a result of prosecution of claims against the Government. Chemithon did not appeal the decision to the Board and seeks to argue it in this court, presumably under the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1) (Supp. V 1981), which provides for trial *de novo* in this court.

Trial Judge Hogenson on July 31, 1981, denied the Government's June 29, 1981 motion to require plaintiff to supplement its petition and brief in support of summary judgment to set forth the proceedings on its claim for the equitable adjustment to the contracting officer. Defendant infers from the denial of this motion that the judge deemed plaintiff's brief an election to seek direct access. *See In re Zweibon*, 565 F.2d 742, 747 n. 20 (D.D.C.1977) (process of amendment can be initiated by presentation of issue for first time on summary judgment).

▮ Defendant is correct that the costs of storage and rebagging properly are not recoverable because the rejected bags subse-

---

6. This letter makes reference to 681 bags, not 614, but refers to the correct Purchase Order, TW 95037-1.

7. The plant manager sent the January 31, 1974 letter.

quently were accepted and paid for by GSA. With respect to attorneys' fees and interest, defendant is also correct that these costs are compensable when incurred in the preparation of termination settlement claims, which is not the basis of Chemithon's claim. *See Kalver Corp. v. United States,* 211 Ct.Cl. 192, 204, 543 F.2d 1298, 1306, *cert. denied,* 543 F.2d 1298 (1977); *cf. Fidelity Construction Co. v. United States,* 700 F.2d 1379 (Fed.Cir.1983) (contract appeals boards lack jurisdiction to award attorneys' fees under the Equal Access to Justice Act, Pub.L. 96–481, 911 Stat. 2325, 28 U.S.C. § 2412 (Supp. V 1981)).

*Right To Withhold Production on Purchase Order 6*

Chemithon argues that the default termination of Purchase Order 6 was legally improper because it had a right to withhold production. (Impossibility of performance is also argued separately.) The Board rejected Chemithon's argument that termination of Purchase Order 6 was improper because Chemithon had been deluged with excessive orders, as well as its arguments directed to impossibility of performance. The argument in this case is pyramided on Chemithon's evidence that 1,570 bags of the dishwashing compound were available at the end of January to satisfy the third, fourth, and fifth Purchase Orders; that GSA refused to inspect Orders 4 and 5; and that, consequently, production was withheld on the sixth because Chemithon was backlogged. The problem is that the Board, based on all the evidence, did not accept Chemithon's inventory as a tender of delivery prior to due date on these orders.

The alleged right to suspend performance is a variation of the argument made before the Board that Chemithon had a right under the contract to reject excessive orders. In fact, as defendant points out, Chemithon did not avail itself of any such right with respect to Purchase Orders 7 and 8, which were received when the backlog developed

during January 1974 and which Chemithon undertook to fulfill.[8]

*Reprocurement Against Purchase Orders 4, 5, and 6*

These Purchase Orders were the subject of the contracting officer's February 19, 1974 termination letter; his Findings and Determination of February 21 that procurement should proceed by negotiation; and his subsequent solicitation of February 22, 1974. Chemithon contends that GSA should have purchased its available stock rather than solicit from other sources. Chemithon's argument, couched in terms of legal error, turns on the Board's factual findings concerning the production and tender of dishwashing compound under Purchase Orders 4, 5, and 6. The Board concluded, with respect to the fifth Purchase Order, that the termination was improper, and the excess costs for the reprocurement against that order were disallowed. With respect to Purchase Orders 4 and 6, the Board found that it was unclear whether the fourth order had ever been produced, and Chemithon has argued that its failure to produce the 481 bags called for by Purchase Order 6 was excusable, in any event. Appellant's Exhibit A–125 indicates that the 1,570 bags available in January are attributable only to Orders 3, 4 and 5, which also vitiates the argument that failure to reprocure against an available quantity for the sixth order was in error.

In three letters written between February 27, 1974, and March 29, 1974, by Chemithon's attorney or president to the contracting officer, Chemithon claimed variously that 1,000, 1,100, and 1,014 bags were on hand, which is short of the 1,570 bags which Chemithon claims were available during the period before the second reprocurement was awarded on April 9, 1974. Because it was unclear what portion of the 1,000-plus bags was attributable to the fifth Purchase Order for 400 bags and the third Purchase Order for 484 bags (the Government ultimately being denied excess reprocurements

---

8. The letter from the plant manager dated January 31, 1974, stated that additional time would be needed to produce Purchase Order 6 for 481

bags and that it had received Nos. 7 and 8 for a total of 2,200 bags.

on these orders), and because the remainder can be attributed to the fourth Purchase Order for 614 bags, which the Board found may not have been produced before GSA initiated the second reprocurement on February 22, Chemithon has not presented a factual record that would support its legal argument that the Government was obligated to reprocure against known available supplies.

*Termination of Purchase Orders Four, Five, Six, and Part of Eight Based on Scarcity of Raw Materials*

Chemithon's sixth argument combines claims of legal and factual error. Chemithon charges that the default termination of Purchase Orders 4, 5, 6, and part of 8 should be overturned because the Board's decision that performance was possible was not supported by substantial evidence and was legally erroneous. The factual finding challenged is that Chemithon failed to exert a sufficient effort to resolve its raw materials difficulties; the legal error is the Board's conclusion that Chemithon's request for assistance did not impose any duty on GSA to advise plaintiff about the national defense priority rating of its contract, which would have entitled it to increased allocations of linear alkyl benzene.

Once again, Chemithon incorrectly characterizes the factual underpinnings of the Board's determination. The record is replete with evidence in the form of Chemithon's answers to interrogatories and testimony of Chemithon's witnesses that, throughout the term of the contract with GSA, Chemithon continued to supply its other customers and, although the regular formula of the product was changed by substituting olofins, linear alkyl benzene was still used. Moreover, only two of the other customers ordering linear alkyl benzene products had a term contract like GSA's. Although Chemithon justified its preference for its regular customers because they were long-term, GSA had been a customer for every year but one since the

early 1960's. The general sales manager of Chemithon's products division testified that Chemithon was able to increase its price to regular customers in 1973–74. Chemithon's president testified that during the contract period 510,500 pounds of linear alkyl benzene on hand at Chemithon's facility were allocated to other products. He agreed that 20 percent of Chemithon's supply of linear alkyl benzene would have been required to produce the full contract order, or 6,245 bags at 16.2 pounds per bag. Ultimately, 3,130 bags were shipped to GSA, representing 50,706 pounds, or ten percent, of the available supply.

Even though the record could only support a finding that Chemithon's raw material shortage was due to reasons other than the availability of linear alkyl benzene, the Board proceeded to consider carefully all the evidence to support Chemithon's claim that it had made every effort to obtain the raw material. Correctly summarized by the Board is the testimony of plaintiff's plant manager that he did nothing more than call several suppliers leaving a message at the order desk.[9] GSBCA No. 4525 at 16. The Board concluded as a matter of law that leaving messages at suppliers asking for salesmen to call back was inadequate, and Chemithon cites no authority that would disturb that conclusion. In *Automated Extruding & Packaging, Inc.*, GSBCA No. 4036, 74–2 BCA ¶ 10,949, aff'd, 75–1 BCA ¶ 11,067, also involving events occurring in the 1973–74 energy crisis, appellant, unlike Chemithon, submitted documentation supporting cancellation of orders and advice from suppliers that appellant's needs could not be met. Performance was excused because appellant demonstrated that it made every effort to obtain resin, another petroleum derivative.

The Board accepted plaintiff's evidence that Chemithon was unaware of the rating, repeatedly had advised the contracting officer of the shortage of raw materials, and requested GSA's assistance in obtaining re-

---

9. This witness testified that he was not sure if the delay in producing Purchase Orders 3, 4, 5, and 6 was due to the raw material shortage.

lief from the shortage. The Board ruled, "We are unwilling to hold that a generalized cry for help imposes on the Government the burden of telling a contractor how to rescue itself from a material shortage." GSBCA No. 4525 at 16. The result is not changed by the fact that the cry was specific in that Chemithon advised GSA that it had no priority rating. *See Angler's Co. Ltd. v. United States,* 220 Ct.Cl. 727 (1979) (failure to assert priority rating a factor in determining whether plaintiff exercised sufficient diligence in attempting to obtain supply). Chemithon offers no authority that would transfer the obligation of securing a priority allocation to the GSA, especially when the inability to fulfill the Government's orders was not attributable to causes beyond Chemithon's control.[10]

*The Reasonableness of the Second and Third Reprocurements*

The final challenge is that the Board erred in upholding as reasonable the price increases on the second and third reprocurements. Previously, with respect to the first repurchase against Purchase Order 3, the contracting officer invited bids from each of the five companies that had originally bid on the contract. Three of these, Continental Chemical Corporation, Time Chemical, and Whitco Chemical Corporation did not make an offer. The second procurement covered Purchase Orders 4, 5, and 6. Three bids were solicited in March 1974 against Chemithon's contract $5.58 per bag price: Purex Corporation, Ltd., bid $17.39; Time Chemical made no offer;[11] and the low bid was Plex Chemical Corporation at $11.50. The third reprocurement against 1,100 bags of the original eighth Purchase Order was solicited in August 1974. Whitco

bid $18.28; Purex Corporation, $22.20; and Plex bid low at $13.00. The contracting officer testified that he attempted telephonically to obtain a lower price on both of Plex's offers, but Plex stood firm.

Abandoning other of its challenges to these reprocurements before the Board, in this court Chemithon focuses solely on the price differential. Plex originally bid $5.99 per bag, 41 cents more than Chemithon's $5.58 bid. Plex's bids accepted on repurchase were 106 percent and 133 percent, respectively, of the contract price. Chemithon argued to the Board, and the Board agreed, that the "bid analysis" prepared by the contracting officer on the second and third reprocurements was unreasonable. The contracting officer provided the following price analysis on the second reprocurement:

> BLS Dept. of Labor Wholesale Price Index reflects a 12.5% increase for Chemicals and allied products for the period January 1973 to January 1974. However, the following increases—Transportation—9%; Packaging and packing—25%; palletization—25% further support this increase. Based on the foregoing and in view of the unstable and inflationary prices for raw materials, labor and paper products, the price is considered reasonable and lowest obtainable at this time. Also, it should be noted that there is a nationwide shortage of raw materials and paper.

Thus, the 71.52 percent increase in components was used to justify the price differential of 106 percent.

With respect to the third reprocurement, the contracting officer's analysis correlated

10. Before the Board and throughout its briefs on appeal, Chemithon made much of allegedly disparate treatment accorded to another producer of hand dishwashing compound, Time Chemical Corp. The Board correctly states that "the record is not at all clear that Time Chemical was more favorably treated than appellant; most of the evidence proferred by appellant for this purpose was inadmissible and is not on the record." GSBCA No. 4525 at 18. In addition, the court notes that Time Chemical allocated 75 percent of its raw material to GSA orders and the balance to commer-

cial orders, whereas Chemithon, by its own admission, could not quantify the degree that its customers were not satisfied during the contract period.

11. The Board suggested that Time Chemical should have been disqualified on the ground of its difficulties in making its own production, but concluded that a solicitation of two, rather than three, qualified bidders did not render the repurchase unreasonable. GSBCA No. 4525 at 20.

the 133 percent price increase to the 105.6 percent increase in price components:

> Price in comparison with ... Chemithon Corp. (6/1/73 to 5/21/74) reflects a 133% increase. BLS Dept [sic] of Labor Wholesale Price Index dated June 1974 reflects a 42.6% increase for Industrial Chemicals for the period June 1973 to June 1974. However, the following increases—Transportation—13%, packing and packaging—25%—and palletization— 25% further supports [sic] this increase. Based on the foregoing and in view of the current upward price trends for raw materials, paper products and labor, the price is considered reasonable.

At trial the judge voiced his concern as to whether it was "fair" to add total percentages of increase when the individual components may have varying percentages of cost. The Board properly characterized this price analysis as "strange" and "expressly disclaim[ed] any reliance on this sort of 'price analysis.'" GSBCA No. 4525 at 26. Then the Board proceeded to substitute its own price analysis,[12] as follows:

> Appellant's own proof of a general shortage of linear alkyl benzine ... lends credence to the Government's contention that unprecedented inflation caused substantial price increases between the time of appellant's bid on the subject contract and Plex's bids on the reprocurements in early 1974.[13] Indeed, the rapid inflation of all petrochemical products resulting from the quadrupling of OPEC prices after the 1973 oil embargo is judicially noticeable. We therefore find that the prices obtained on reprocurement were not unreasonable.

GSBCA No. 4525 at 19–20.

The quadrupling of OPEC prices after the 1973 oil embargo may be judicially noticeable, but applying a 400 percent increase to any of the components of plaintiff's contract price lacks any basis in the record.

The cost components of Chemithon's $5.58 contract price were—Chemicals and allied products: linear alkyl benzene $1.82, sodium sulfate $.24, other raw materials $1.12—for a total of $3.18; transportation: $.15; packaging and packing: $.24; palletization: 0; labor and overhead: $2.33 (of which the drying cost was $.90); minus a 32¢ profit—for a total of $5.58.

Assuming that the 400 percent increase in linear alkyl benzene occurred, that component becomes $7.28, generating a corresponding price of $11.04, which is close to Plex's $11.50 bid on the second reprocurement, although not to the $13.00 bid on the third reprocurement. The assumption is unwarranted, however, because it makes the effect of the quadrupling operative by April, which is contradicted by the testimony of the contracting officer that over the contract period there was a 50 percent increase in petrochemicals (corresponding to the Bureau of Labor Standards statistics on the third reprocurement). Applying the 50 percent rate to all raw materials produces an adjusted price of $7.17 against which the Plex awards appear high, even if the price is inflated further to account for the other petroleum-related costs—plant, fuel, and transportation.

■ Chemithon is incorrect that whether excess costs are reasonable is a legal question. The Court of Claims held in *H & H Manufacturing Co.*, 168 Ct.Cl. 873 (1965), a case also involving competitive bidding pursuant to negotiation, that such a determination "is typically and traditionally a question of fact." *Id.* at 885 (citation omitted); *accord, ASC System Corp. v. United States*, 223 Ct.Cl. 672, 673 (1980) (board's findings that defendant failed to establish the reasonable value of reprocurement entitled to finality and binding on the Government). In that regard, a contracting officer has broad discretion in reprocurement. *Federal*

**12.** Inexplicably, a draft of the administrative judge's opinion appears in the certified record. The draft found that the solicitations constituted reasonableness. However, that judge did not participate in the Board's decision, which underscores that the panel deliberately went beyond the circumstances of the solicitation in making its reasonableness determination.

**13.** The statement is inaccurate. The reprocurements were in April and late August 1974.

*Electronic Corp. v. United States,* 202 Ct.Cl. 1028, 1039, 486 F.2d 1377, 1383 (1973), citing *Astro-Space Laboratories, Inc. v. United States,* 200 Ct.Cl. 282, 308, 470 F.2d 1003, 1018 (1972) (*per curiam*); see *Industrial Design Laboratories v. United States,* 28 CCF ¶ 81,470, at 86,953 (1981) (WEISE, J., as Trial Judge). The court in *Astro-Space* differentiated among the contracting officer's obligations to act within a reasonable time after default, to obtain a reasonable price, and to mitigate the default by contractor's damages. 200 Ct.Cl. at 308, 470 F.2d at 618.

Thus, the inquiry in the context of Chemithon's challenge to price is whether the Board's decision that the contractor obtained a reasonable price is supported by substantial evidence, even though the contracting officer's and the Board's price justifications were faulty.[14] In oral argument, government counsel was questioned as to whether the Government must justify the reasonableness of the price by a mathematical analysis. He responded that the supply/demand situation was impacted by the oil shortage, which accounted for the price increase.

This court is reluctant to breathe life into the contracting officer's and the Board's findings, and precedent could support a reversal. *See Dillon Total Maintenance, Inc. v. United States,* 218 Ct.Cl. 732, 736 (1978) (failure to mitigate damages by soliciting insufficient bids to ensure competitive price buttressed by the fact that the reprocurement price was 68 percent higher than the initial procurement price). However, the record demonstrates that Chemithon's conceded preference for its other customers over GSA's fixed-price contract caused GSA to pay Plex's price. Unlike *Dillon,* the solicitations on reprocurement included the bidders on the original contract, none of which was lower than Plex. Moreover, while Board cases require some mathematical justification of the price on reprocurement, also weighed are factors of fault and the

circumstances of the solicitation that concerned the Court of Claims in *Dillon.*

In *Dakota Process Equipment Co.,* ASBCA No. 4435, 58–2 BCA ¶ 1,981, the Board dealt with a 155 percent increase on reprocurement over the former adjusted bid price. "The justification for this difference does not appear in the record and the Government has the burden of establishing to the satisfaction of the Board that the increase was the result of the default of the appellant." *Id.* at 8,085 (citations omitted). The record demonstrates that the Board was so satisfied in this case. In *P.L. Andrews Corp.,* ASBCA No. 5722, 60–2 ASBCA ¶ 2,787, the Board found the procurement was made at a reasonable price when the repurchase contract was awarded to the second low bidder whose price originally greatly exceeded appellant's, but on reprocurement was only marginally greater than its contract bid. The situation is reversed here, but the court is persuaded that the barometer of reasonableness is not the similarity of Plex's bids on reprocurement with its original offer. To the contrary effect is *Prextex, Inc.,* ASBCA Nos. 21284, et al., 1981 BCA ¶ 14,882, relied on by Chemithon. Prextex involved sole-source contract, and the Board rejected the determination of excess costs (over 40 percent higher than the original contract) because the price analysis lacked cost information. That a sole-source contract was involved, however, was the starting point for the Board's approach. *Id.* at 73,612.

The court is confronted with ample evidence that Plex, the original second low bidder, was the low bidder and would not lower its bid; that other bidders were within a range much higher than the original bidding; that the oil shortage caused an obvious, but unquantifiable, price increase in the linear alkyl benzene and transportation and fuel components of the contract price; and that Chemithon, too, raised its prices during the contract period, passing on its increased production costs to custom-

---

14. The contracting officer could have supplied the requisite factual reasonableness by seeking an explanation from Plex for its increased

costs. *See Reliable Maintenance Service,* ASBCA No. 11010, 68–1 BCA ¶ 6,853, at 31,695 (1968).

ers other than GSA. Substantial evidence thus supports the prices on reprocurement as the lowest GSA could obtain in the circumstances brought about by Chemithon's default.

## CONCLUSION

Accordingly, plaintiff's cross-motion is denied and defendant's cross-motion is granted, and judgment will enter on defendant's counterclaim in the amount of $14,139.30, plus interest at 8¾ percent per year from January 30, 1976, to the date paid, and the petition will be dismissed.

IT IS SO ORDERED.

Costs will not be assessed.