**COFLEXIP & SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 33–88C.

United States Claims Court.

May 2, 1991.

Stephen T. Owen, Washington, D.C., for plaintiff.

Richard E. Rice, Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This matter is again before the court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the United States Claims Court (RUSCC) following partial denial of their prior cross-motions for summary judgment in *Coflexip & Servs., Inc. v. United States*, 20 Cl.Ct. 412 (1990) (*Coflexip I*). For the reasons stated below, the court now grants defendant's motion for summary judgment, and denies plaintiff's cross-motion for summary judg-

ment for costs incurred in developing a prototype of its offered design.

## FACTS

Plaintiff Coflexip & Services, Inc., an unsuccessful offeror on a component of an Offshore Petroleum Delivery System (OPDS) contract awarded by the United States through the Department of Transportation, Maritime Administration (MarAd), seeks damages for defendant's breach of an implied contract to consider plaintiff's proposal honestly and fairly.[1]

On March 2, 1984, AMETEK, a subagent acting for Watters Marine, Inc., MarAd's general ship operating agent, issued a Request for Proposals (RFP) to procure a system that would deliver petroleum from a tanker anchored offshore to an on-shore military facility. The RFP sought proposals for three primary components: a tanker, a single point mooring system, and a flexible pipe conduit system. Offerors could propose to furnish the entire system, a single component, or a combination of components. The RFP stated the standard and level of performance required of the entire system but provided little, if any, technical guidance as to how contractors were to meet those requirements.

Shortly after issuance of the RFP, plaintiff and five other companies submitted proposals to furnish some or all of the components for the requested system. Plaintiff submitted a proposal to furnish only the flexible conduit system. AMETEK reviewed and immediately eliminated four of the proposals, and recommended further review of the proposals of plaintiff and Simplex Wire & Cable, the remaining offerors on the flexible conduit pipeline component of the system. Throughout April and May, 1984, plaintiff, MarAd, and Watters discussed various aspects of the procurement, the significance of which the parties dispute. In July, 1984, MarAd informed plaintiff that the contract for the flexible conduit would go to Simplex, and

---

1. The OPDS was a project of the Department of the Navy, but because the system was more in the nature of a commercial, as opposed to a military, venture it contracted with MarAd, which was more experienced with commercial projects, to procure the system.

formally awarded the contract to Simplex on August 3, 1984.

Coflexip filed a formal protest of the award with the General Accounting Office (GAO) in October, 1984. The comptroller General found Simplex's system technically superior, but that the government had breached its implied-in-fact contract to consider plaintiff's proposal honestly and fairly. Specifically, the Comptroller General opined that defendant had relaxed certain technical specifications and the delivery schedule for Simplex, but not for plaintiff. The Comptroller General declined to overturn the contract award in the matter of Coflexip & Services, Inc. because of the high costs of terminating for convenience, but did conclude that plaintiff was entitled to reimbursement for its proposal preparation costs. 85–1 Comp.Gen.Proc.Dec. 554 (May 16, 1985).

Pursuant to the GAO finding, plaintiff filed a claim with the United States for $257,142.63 which amount included costs associated with the development of a prototype of its flexible conduit pipe system, and the protest before the GAO. The Defense Contract Audit Agency (DCAA) performed an audit of plaintiff's claim and found that plaintiff incurred approximately $200,-000.00 of its claimed $257,142.63 proposal preparation expenses after it submitted its technical and cost proposals in March, 1984. It concluded that post-submission costs could not be considered proposal preparation costs. Based on the audit, defendant reimbursed plaintiff for only $54,-141.00 of the total amount claimed. This figure did not include any costs associated with the prototype. In *Coflexip I*, plaintiff sought the cost of the protest and prototype costs. Both parties moved for summary judgment.

This court granted summary judgment for defendant on plaintiff's claim for protest costs because the Competition in Contracting Act of 1984 (CICA), Pub.L.N. 98–369, 98 Stat. 1175, was not in force at the time defendant issued the RFP. Absent the specific waiver of sovereign immunity contained in CICA, this court found that it had no jurisdiction to award recovery of a money judgment for contract protest costs against the United States. *Coflexip I*, 20 Cl.Ct. at 415, (citing *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607 (1980)); *see also United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (*en banc*), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). The court did not grant summary judgment on the costs incurred by plaintiff in developing a prototype of the flexible conduit system because it could not conclude, as a matter of law, that defendant did not require or induce plaintiff to develop a prototype of its system as a precondition to contract award.

## DISCUSSION

An unsuccessful bidder's standing to challenge the award of a government contract is based on an implied-in-fact contract, arising upon the submission of a proposal, that the government will consider the proposal honestly and fairly. *Heyer Prods. Co. v. United States*, 140 F.Supp. 409, 135 Ct.Cl. 63, 69 (1956). The terms of the implied contract are those elements of the RFP governing activities of offerors and the government prior to award of the contract. *AT & T Technologies, Inc. v. United States*, 18 Cl.Ct. 315, 321 (1989). An unsuccessful bidder may recover only those costs incurred in preparing its technical proposal or bid. *Keco Indus. Inc. v. United States*, 192 Ct.Cl. 773, 785 (1970).

Federal Procurement Regulation (FPR) § 1–15.205–3, 41 C.F.R. 1.205–3, *Bidding Costs*, (in effect in 1984) stated that bid and proposal costs were the "costs of preparing bids or proposals on potential Government and non-Government contracts or projects, including the development of engineering data and cost data necessary to support the contractor's bids or proposals." For plaintiff to recover its prototype costs, it would have to show entitlement to such costs under something other than FPR 1–15.205–3, which authorizes recovery only for engineering data which is, as its name implies, data—facts and figures—not

demonstrable evidence. Traditionally, in government contracting, engineering data is information either asked for in an invitation for bids or RFP, or, in a negotiated procurement, provided with the technical proposal, or furnished later to give the evaluator a reasonable assurance that the offered item will function as designed. It can encompass, for example, manufacturing control drawings, qualification test reports, quality assurance procedures, etc., *i.e.*, technical data. *See, Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 764 (1985); 48 C.F.R. 927.401. The Department of Energy has defined technical data as including such items as "engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related *information*." *Id.* (Emphasis supplied.) While not directly on point, the Energy Department's regulations are helpful by analogy. Here, plaintiff submitted a plethora of information with its original offer, and arguably could have submitted additional information during any subsequent negotiations, to support its proposal. FPR § 1–15.205–3. But for plaintiff actually to construct a prototype, which no doubt will serve it well in other ways, and attempt to categorize it as "necessary" or "engineering data" so as to justify reimbursement for its costs by the government, clearly is beyond the boundary of recoverable proposal preparation costs as defined by case law and the procurement regulations. *Id.*

In order for plaintiff to recover its costs of developing and constructing a prototype flexible pipe conduit system, the court must find that it was a legitimate precondition to contract award. That requirement could arise in two conceivable ways; as a specific requirement of the RFP, or by inducement—either expressly, or forcefully implied—by statements or actions of defendant. The court finds neither.

A. *Plaintiff Was Not Required By The RFP To Build A Prototype As A Precondition To Contract Award.*

 Plaintiff frankly admitted that no term of the RFP expressly required devel-

opment of a prototype as a precondition to final award of the contract. Instead, plaintiff relied generally on four solicitation documents to support its contention that the "solicitation in this case specified that demonstration of the proposed conduit pipe would be a prerequisite to final award." These documents were a pre-solicitation letter of February 24, 1984 from Watters to plaintiff, a March 2, 1984 letter from AMETEK to plaintiff, the Preliminary Performance Specifications, and the Proposal Evaluation Procedures. The latter two documents were issued with the RFP. Plaintiff also pointed to four other documents, not part of the solicitation, for additional support for its position. Those documents are the Minutes of the Bidder's Conference of March 13, 1984, Bidder's Conference Questions and Answers in a letter dated March 13, 1984, a telex dated June 1, 1984, from Watters to plaintiff, and a telex dated June 15, 1984, from Watters to MarAd.

The court has reviewed the documents and finds that none specified, or even suggested, development and demonstration of a prototype as a precondition to final award. Furthermore, the language and the requirements of the RFP are clear and unambiguous. The RFP stated that:

"AMETEK/Offshore, acting for Watters Marine, Inc., the prime contractor for the subject project, is soliciting technical proposals for OPDS hardware. This request will lead to the procurement of hardware for a complete OPDS system. The requested information will be used to establish the competence and ability of the vendor, technical feasibility of his approach to meeting the performance and functional requirements for OPDS, and to assess the vendor's ability to meet the schedule. Schedule is of the essence in this project. Delivery of hardware shall be such that installation and initial check-out may be performed to support Watters Marine acceptance tests to be conducted on or about 1984 August 1."

The RFP outlined a procurement process under which defendant required only the prime contractor, Watters, to demonstrate

the proposed OPDS system as a precondition to final acceptance of the whole system by the government. Plaintiff's representative, Mr. Laloe, in fact, acknowledged in his deposition this plain meaning of the RFP, and candidly admitted that plaintiff did not interpret the RFP as requiring development of a prototype at the time it submitted its technical proposal. The February 24, 1984 letter from Watters, as acknowledged by plaintiff's representative, was a presolicitation statement of work identical to the official RFP, but which also delineated some of the prime contractor's obligations to the government, which the RFP did not. Section C, paragraph 8 of this document, *Prime Contractor Procedural Tasks, Pre–JLOTS Demonstration,* stated:

"The prime contractor will demonstrate, in August, 1984 the ability to successfully deploy the entire POL [Petroleum, Oil, Lubricant] Delivery System. The purpose of this demonstration is to enhance the training of personnel, including any training required for Navy warping tug or equivalent Army lighter crews, and to finalize deployment procedures before the JLOTS [Joint Logistics Over The Shore] demonstration."

This document clearly states that demonstration of the entire system was a condition imposed only upon Watters and did not apply to component suppliers. This is at odds with plaintiff's interpretation of the RFP which, by extension of logic, would require development of a prototype for, at the least, every major component of the system prior to acceptance by defendant. Defendant could not have intended this result because it gave the same RFP to every potential offeror regardless of, and perhaps not even knowing, the component each offeror intended to supply.

Plaintiff attempted to undermine the plain meaning of the RFP by claiming that only the flexible conduit required a state of the art design, and thus only the flexible conduit required development of a prototype in order to demonstrate the credibility of the proposed component. Plaintiff simply is incorrect, considering the technical, state of the art problems associated with all of the major components. *See infra*

footnote 2. Assuming, *arguendo,* that only the flexible conduit component of the OPDS required state of the art design and development, in light of the plain language of the RFP, plaintiff cannot rely on its own subjective, unexpressed interpretation. Plaintiff pointed to no document in which it communicated its interpretation of the RFP to defendant, and apparently never told defendant that it was developing a prototype. Plaintiff can refer only to a general reference made in its budgetary proposal breakdown which did not mention the prototype, but which listed "other engineering expenses" already incurred, but not included in its costs. "A court may not give preference to the subjective unexpressed intent of one of the parties." *Tibshraeny Bros. Constr., Inc. v. United States,* 6 Cl.Ct. 463, 469 (1984).

Plaintiff also asserted that, as a practical matter, the solicitation required development of a prototype to demonstrate the credibility of its proposal. Plaintiff argued "[t]he solicitation documents ... impose a duty to demonstrate proposal credibility and due to those evaluation factors, Coflexip felt that its prototype program was the only way to comply with that criteria and successfully compete for award." Plaintiff claims to find support for its argument in the second paragraph of RFP which stated the degree of technical credibility offerors were required to submit with their technical proposals. It stated:

"Vendors are asked to include a summary of which portions of the OPDS are being offered, with a synopsis of the scenario for design approach, fabrication, installation, deployment and retrieval methods, and statements of how the proposed hardware meets or does not meet the performance requirements. Prospectuses submitted should be as complete as possible, inasmuch as requests for "best and final" proposals are not anticipated."

The RFP did not contemplate post-submission revision and elaboration of offerors' technical proposals, as evinced by the rejection of a best and final offer requirement. Proposals were to provide a "synopsis of the scenario for design approach" and "statements of how the proposed hardware meets or does not meet the performance

requirements." Nowhere can the court glean from this statement even a scintilla of justification or need for a prototype. The RFP did not require a prototype to support the technical proposal, or for any other reason.

B. *Plaintiff Has Failed To Provide Any Evidence That Defendant's Agents Induced Plaintiff Into Developing The Prototype.*

■ After *Coflexip I,* this court asked the parties to address the issue of whether defendant's agents were authorized to induce plaintiff to incur the expense of building a prototype, that the RFP did not require. Because the RFP did not require a prototype, and plaintiff apparently did not even contemplate developing a prototype prior to submitting its proposal, any inducement by defendant would have had to have occurred during subsequent negotiations in which defendant asked plaintiff to support or defend its technical proposal. Such a request would be appropriate in a negotiated procurement, if "necessary," when defendant enters into final contract negotiations with an offeror and, in the proper circumstances, defendant might be liable for allowable costs incurred by an offeror after submittal of its initial technical proposal. But in order to reach the inducement issue properly, and to withstand defendant's summary judgment motion, plaintiff must show a negotiation process in which defendant's agents requested from plaintiff additional proof of capability that could not be satisfied with engineering data, or took a course of action that plaintiff reasonably could believe required it to furnish a prototype to support its technical proposal.

Plaintiff prefaced its inducement argument by noting that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them." *Kinnett Dairies Inc. v. Farrow,* 580 F.2d 1260, 1277 (5th Cir.1970). Citing *CACI Field Serv. Inc. v. United States,* 13 Cl.Ct. 718 (1987), plaintiff claimed that contracting officers may pursue courses of conduct "not inconsistent with the evaluation criteria." Coupled with these broad principles, plaintiff asserted that "no procurement statute, no procurement regulation, and no

term of the solicitation precluded evaluation of a prototype by procurement officials." Plaintiff also asserted that at least two of the evaluation procedures were not inconsistent with the development of a prototype. To wit:

—Credibility of proposal (feasibility of state of the art approaches and concepts, low technical risk, confidence in performance of hardware, simplicity of procedures, technical soundness).

—Demonstrated understanding of the challenge (detailed integration of potential problems and technical risk areas, trade-offs, steps in selection, transport, aspects of the system including installation, maintenance operation, repair of/recovery from failures, hazards, safety, etc.).

All those assertions are true, but merely beg the question.

The gravamen of plaintiff's inducement argument was that defendant, in continuing to communicate with plaintiff during April and May of 1984, led plaintiff to believe its proposal still was under consideration. This was so. Plaintiff assumed, however, that because it had decided to develop a prototype and defendant did not tell it not to incur additional costs, *a fortiori,* defendant induced plaintiff into building the prototype. Plaintiff's argument is specious because it fails to consider that it never informed defendant it was developing a prototype until after the contract was awarded to Simplex. One telephone call, or letter, could have prevented this entire dispute, but for reasons known only to itself, plaintiff chose to act, if not secretly, at least in a vacuum. Defendant could not have instructed plaintiff not to develop a prototype because it had no idea that plaintiff was doing so. Nor could defendant reasonably have guessed that plaintiff would choose to expend large sums of money in support of its technical proposal during the negotiation phase of the procurement because defendant had not asked for any significant clarification of the proposal, or, for that matter, even discussed the proposal to any extent with plaintiff. The court, after carefully reviewing plaintiff's arguments and the complete record, specifically finds that no document, individually

or collectively, specified, or even implied, that demonstration of the conduit through a prototype was a prerequisite to final award of the contract, thereby constituting the requisite inducement. There is a reference made by defendant to a "prototype" in the minutes of bidders conference, but this clearly is a general reference to the "prototype" Watters would provide for the Pre–JLOTS demonstration.[2] Plaintiff can point to no request made by the government or it's agents for clarification of plaintiff's technical proposal that reasonably could have induced plaintiff into building a prototype, nor is there any indication that defendant knew of plaintiff's prototype development plans and acquiesced in them.

A decision to furnish the government with more factors for evaluation than required, such as a prototype, is exclusively that of the offeror, and common sense dictates granting a certain degree of latitude in that decision. The real question is not whether additional evaluation factors may be offered, but at what point does the government become liable for the cost of the additional factors within the narrow confines of the facts of this case. The record here conclusively shows that defendant could have gained no benefit from the development of the prototype. By plaintiff's own admission, it started development of the prototype only after it submitted its technical proposal, but even more telling, it never informed defendant of the existence of the prototype until the time of award to Simplex. The court must find that the prototype was not used as a part of, or to support, plaintiff's technical proposal and, indeed, could not have been. Plaintiff's unilateral decision to develop the prototype purportedly in order to demonstrate the credibility of its proposal was a business decision made solely by plaintiff which cannot impose liability on defendant in a claim for proposal preparation costs. On the issue of inducement plaintiff has failed to meet its burden of showing reliance upon actions of the government's

agents to justify its development of the prototype. "(T)he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## CONCLUSION

For the foregoing reasons, the court grants defendant's motion for summary judgment and denies plaintiff's cross-motion for summary judgment for the unreimbursed costs associated with building the prototype. The Clerk of the court is directed to enter judgment accordingly. Costs to defendant as the prevailing party.

IT IS SO ORDERED.

---

**2.** The defendant's representative at the Bidders Conference stated:

"What we are seeking here is to give you, the offerors, the widest possible latitude. There is no system designed for the POL [Petroleum, Oil, Lubricant] delivery system. It is a series of conceptual ideas, one of which or a combination of which we would seek to integrate into a final system, or at least into a quote 'prototype', unquote, type of system."